[Cite as *State v. Gardner*, 2017-Ohio-7241.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

## JOURNAL ENTRY AND OPINION
## No. 104677

---

# STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

# TIMOTHY GARDNER

### DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED IN PART; REVERSED IN PART

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-604359-A

**BEFORE:** E.A. Gallagher, P.J., Stewart, J., and Jones, J.

**RELEASED AND JOURNALIZED:** August 17, 2017

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY: Frank Romeo Zeleznikar
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, P.J.:

{¶1}    Defendant-appellant Timothy Gardner appeals his convictions for aggravated menacing, obstructing official business and having weapons while under disability.   Gardner contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.   He also contends that the trial court erred in ordering him to pay costs that it did not impose at the sentencing hearing.   For the reasons that follow, we affirm Gardner's convictions for aggravated menacing and obstructing official business and vacate his conviction for having weapons while under disability.

**Factual and Procedural History**

{¶2} On March 15, 2016, a Cuyahoga County Grand Jury indicted Gardner on seven counts — one count of domestic violence, one count of aggravated menacing, one count of obstructing official business, one count of having weapons while under disability, one count of trafficking, one count of drug possession and one count of possessing criminal tools.   The charges arose out of a January 26, 2016 incident in which Gardner allegedly hit his girlfriend, Tierra Mosey, in the face during an argument, then threatened to shoot her, her children and the police.   Police officers apprehended Gardner in the backyard of his parents' house and, during a search incident to his arrest, found a bag of suspected crack cocaine in his hat.    When police conducted a search of the area after they apprehended Gardner, they recovered a gun that had been hidden in the bottom of a fire pit in the backyard, a few feet from where Gardner was apprehended.

{¶3} Gardner waived his right to a jury trial. At trial, the state presented testimony from five witnesses — Mosey, CMHA police officers Robert Lenz, Aaron Luther and Ashley Jaycox and Detective Darren Reeves with the Cleveland Police Department's domestic violence unit.

{¶4} Mosey testified that on the evening of January 26, 2016, she and Gardner got into an argument when Gardner, Gardner's friend Devotie Cobb, III and Gardner's sister, Tiffany Gardner ("Tiffany"), were moving Gardner's belongings out of Mosey's apartment. Mosey claimed that Gardner was drunk and that Gardner "back-smacked" her, i.e., hit her with the back of his hand, in the side of the face, causing her to fall down a short flight of stairs. Mosey testified that after Gardner hit her, she was "mad" and that the side of her face was "a little numb for a minute" but that she "didn't have no bruises," "did not hurt nothing" and was not treated for any injuries as a result of the incident.

{¶5} Mosey ran out of the apartment, told Tiffany she was going to call the police and then went over to an aunt's house from where she called 911. After calling the police, Mosey returned to her apartment. Gardner left before the police arrived.

{¶6} CMHA police officers Lenz, Luther and Jaycox responded to the call and began questioning Mosey about the incident. While Mosey was talking with the police, Gardner called her ten or more times on her cell phone. At the direction of one of the officers, Mosey ultimately answered the phone and activated the speaker function so that the officers could hear their conversation. Mosey testified that Gardner said, "B****,

I'm about to come shoot you and your kids." When Mosey informed Gardner that she was with the police, Gardner responded that he "didn't care" and that he "got one for them, too."

{¶7} Officers Lenz, Luther and Jaycox overheard Mosey and Gardner's conversation. Officer Lenz testified that he heard Gardner state "several times" that "he couldn't believe she called the cops on him," that he would shoot her and her two sons and that if any law enforcement officials "came out to him," he was going to "shoot it out with them," too. Officers Luther and Jaycox offered similar testimony, i.e., that Gardner was upset that Mosey had called the police, that he threatened to kill Mosey and her children and that he stated that if the police came to his location, he would shoot them, too.

{¶8} After hearing Gardner's threats, Officer Luther identified himself to Gardner and asked Gardner his location. After several requests for the information, Gardner told the officer that he was at his parents' house on Project Avenue in Cleveland and gave the officer the address.

{¶9} Officers Luther and Lenz proceeded to Gardner's parents' house while Officer Jaycox stayed behind with Mosey and continued to interview her. Officer Jaycox testified that Mosey told her that she had previously seen Gardner with what Mosey described as a silver and black .38 caliber firearm and that "about a month prior, whenever he had carried the firearm," Gardner "would store" it in his parents' backyard "in the vicinity between a parked car and a fire pit." Officer Jaycox testified that she

relayed this information to the other officers who were attempting to apprehend Gardner; however, Officer Luther denied that he received the information.

{¶10} When Officers Luther and Lenz arrived at Gardner's parents' house, Gardner was in the front yard in an "aggressive stance." Gardner ignored the officers' commands to get on the ground and, instead, told the officers to "[c]ome on," then ran into the house through the front door out the side door and into the backyard. Officer Luther followed Gardner into the house while Officer Lenz went around the side of the house towards the backyard.

{¶11} Officer Lenz testified that when he made contact with Gardner in the backyard, he told Gardner "several more times to get on the ground" before Gardner finally complied. He testified that, at this point, additional officers arrived on scene who assisted in handcuffing Gardner and placing him in the zone car. During a search incident to his arrest, officers discovered a bag of suspected crack cocaine hidden in the brim of a winter hat Gardner was wearing. Police also recovered a .22 caliber revolver in the bottom of a fire pit in the backyard, a few feet from where Gardner was apprehended. Detective Reeves testified that the gun was analyzed for fingerprints but that "[n]o latent prints of value were detected." The suspected drugs were tested and determined to be crack cocaine.

{¶12} After the state presented its case, Gardner moved for a dismissal of all counts under Crim.R. 29. The state conceded that it had not presented sufficient

evidence on the trafficking count. The trial court granted Gardner's motion for acquittal on the trafficking count and denied the motion as to the remaining counts.

{¶13} In his defense, Gardner presented testimony from his sister Tiffany and his friend Cobb who were helping Gardner move out of Mosey's apartment at the time of the alleged incident. Tiffany claimed that Mosey was begging Gardner not to leave and denied that Gardner struck Mosey. Tiffany testified that she was peering through the screen door the entire time Gardner was in the apartment retrieving his belongings and that "ain't nobody touch her." Tiffany claimed that this was not the first time Mosey had lied, but rather, that "she do this all the time." Tiffany described a prior incident in which Mosey had posted a photograph on social media claiming that Gardner had given her a black eye, then, five minutes later, posted another photograph without it, saying that she "was just playing" and that she had used makeup to create the "black eye."

{¶14} Cobb likewise denied that Gardner hit Mosey. He testified that he was sitting at the bottom of the stairs waiting for Gardner to come back with more of his belongings when Mosey stopped Gardner on the stairs asking why he was leaving her. Cobb testified that Gardner told her that their relationship was over and that the couple argued for approximately 20 minutes before Gardner eventually went up the stairs "to go past her." Cobb testified that Gardner "brushed up on [Mosey]" as he went up the stairs then came back down and handed Cobb a bag to take to the car. Cobb testified that before he left the porch, Mosey ran past him, telling Tiffany that Gardner had hit her. Cobb testified that he asked Mosey when Gardner had hit her. Mosey did not answer his

question but said that they "better hurry up and leave" because she was calling the police.

At the close of all the evidence, Gardner renewed his Crim.R. 29 motion. The trial court, once again, denied the motion.

{¶15} The trial court found Gardner guilty of aggravated menacing in violation of R.C. 2903.21(A), obstructing official business in violation of R.C. 2921.31(A), having weapons while under disability in violation of R.C. 2923.13(A)(3) and drug possession in violation of R.C. 2925.11(A). The trial court found Gardner not guilty on the remaining counts. Gardner was sentenced to two years of community control sanctions on each count. Although the trial court did not mention costs at the sentencing hearing, on June 1, 2016, the trial court issued a sentencing journal imposing costs.

{¶16} Gardner appealed, raising the following three assignments of error for review:

Assignment of Error I:
Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

Assignment of Error II:
The convictions were against the manifest weight of the evidence.

Assignment of Error III:
The trial court erred by imposing costs where it found appellant

indigent, did not impose costs in open court and failed to consider

his inability to pay.

**Law and Analysis**

**Sufficiency of the Evidence and Manifest Weight of the Evidence**

{¶17} In his first and second assignments of error, Gardner contends that the trial court erred in denying his Crim.R. 29 motion for acquittal and that his convictions for aggravated menacing, obstructing official business and having weapons while under disability lack sufficient evidence and are against the manifest weight of the evidence.[1] Although they involve different standards of review, because they involve interrelated issues, many of the same arguments and a review of the same evidence, we address Gardner's first and second assignments of error together.

{¶18} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence challenge. *Id.*

{¶19} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state met its burden of production. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is

---

[1]Gardner does not challenge his conviction for drug possession.

to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25; *Jenks* at paragraph two of the syllabus.

{¶20} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1977), citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Weight of the evidence involves "the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing at *Thompkins* at 386-387. The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967),

paragraph one of the syllabus. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

**Aggravated Menacing**

{¶21} Gardner was convicted of aggravated menacing in violation of R.C. 2903.21(A). R.C. 2903.21(A) provides, in relevant part: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person * * * or a member of the other person's immediate family." R.C. 2903.21(A). Aggravated menacing does not require proof that the defendant is able to carry out his or her threat or that the defendant intends to carry out the threat or believes himself or herself capable of carrying it out. *See, e.g., State v. Perkins*, 8th Dist. Cuyahoga No. 86685, 2006-Ohio-3678, ¶ 14. Nor does it require an "imminent fear of serious physical harm." *State v. Wetherby*, 5th Dist. Licking No. 12-CA-69, 2013-Ohio-3442, ¶ 63. "What is necessary to establish the crime of aggravated menacing is the victim's subjective belief that the defendant will cause serious physical harm. * * * [A] person can be convicted of aggravated menacing even though the person has not made any movement toward carrying out the threat." *Perkins* at ¶ 14; *see also State v. Thomas*, 8th Dist. Cuyahoga No. 104174, 2017-Ohio-957, ¶ 22 ("'In order to prove aggravated menacing, the state must show that the victim had a subjective belief of fear of serious physical harm.'"), quoting *State v. Landrum*, 1st Dist. Hamilton No. C-150718, 2016-Ohio-5666, ¶ 9. It is sufficient if the defendant knowingly causes

the victim to believe the defendant will carry his or her threat into execution. *State v. Walker*, 8th Dist. Cuyahoga No. 88694, 2007-Ohio-4047, ¶ 14. A person acts knowingly when "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶22} Gardner does not dispute that he threatened to cause Mosey and her children "serious physical harm" or that he acted "knowingly." Rather, Gardner argues that his conviction for aggravated menacing should be overturned because (1) the state failed to prove that Mosey "actually believed" Gardner would cause her or her sons serious physical harm and (2) to the extent Mosey claimed she feared Gardner would harm her or her children, her testimony was not credible. In support of his argument, Gardner points out that when he threatened to shoot Mosey and her children, the police were already at her apartment, that Gardner thereafter disclosed his location to the police and that the police immediately went to Gardner's location and apprehended him. He also points to testimony by his sister which he contends shows that "lying was typical behavior for Mosey" and that Mosey had previously falsely accused Gardner of hurting her.

{¶23} The state presented competent, credible evidence from which the trial court could have reasonably found that Mosey subjectively believed that Gardner would carry out his threat and cause serious physical harm to her or her children. Mosey testified that Gardner was drunk and agitated and that, earlier that evening when they were at her parents' residence, she had to take him outside to "try to calm him down" "[b]ecause he go crazy." Mosey further testified that after Gardner left her apartment

and while she was talking with the police, Gardner called her cell phone ten times before she answered it. Heedless of the consequences, and notwithstanding Mosey's statement to him that she was with the police, Gardner threatened to shoot not only Mosey and her children but also the police. Mosey testified that she had previously seen Gardner with a gun. She further testified that when she heard Gardner's threats, she was "scared" because "you never know what he will do" and because "you never know what a drunk person will do." Officer Jaycox testified that when she interviewed Mosey after the incident she was "[v]ery upset," was crying and "appeared to be afraid." Further, Mosey testified that Gardner had struck her earlier that evening. Although the trial court determined that the state did not prove its domestic violence charge beyond a reasonable doubt, Mosey's testimony that Gardner had acted out violently against her earlier that evening was nevertheless probative of her state of mind and could support the trial court's finding that Mosey believed Gardner would seriously harm her or her children.[2]

{¶24} With respect to Gardner's challenges to Mosey's credibility, including Tiffany's testimony regarding Mosey's "propensity to lie," even assuming what Tiffany said was true, it would not preclude the trial court from believing all or part of Mosey's testimony in this case. The trial court was in the best position to weigh the evidence and

---

[2]Although Gardner contends that "[b]y rendering a not guilty verdict on the domestic violence charge, the court demonstrated that it did not find Mosey's testimony or allegations against Gardner credible," that contention is contradicted by the record. In issuing its verdict on the domestic violence charge, the trial court specifically stated that "there was credible evidence from the victim in this case." The trial court, however, indicated that because "[t]here was contrary evidence about possible motivation," the state did not meet its high burden of proving that offense beyond a reasonable doubt.

assess the witnesses' credibility and was entitled to believe or disbelieve all, part or none of each witness' testimony. Based on the record here, we cannot say that the trial court "clearly lost its way" or "created a manifest miscarriage of justice" in convicting Gardner of aggravated menacing under R.C. 2903.21(A).

**Obstructing Official Business**

**{¶25}** R.C. 2921.31(A) states:

No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

**{¶26}** Gardner challenges his conviction for obstructing official business on sufficiency and manifest weight grounds because (1) he did not flee from Mosey's apartment, rather, he was moving out, (2) he told the police, when asked, where he was and (3) he was "readily apprehended" once police arrived at his parents' house. Although Gardner acknowledges that Officer Lenz testified that Gardner's actions made it "a little harder" for police to apprehend him, he contends that such evidence was not sufficient to support his conviction for obstructing official business. We disagree. The record reflects that the state presented substantial credible evidence supporting Gardner's conviction for this offense.

**{¶27}** Obstructing official business under R.C. 2921.31(A) has five essential elements:

> "'(1) an act by the defendant, (2) done with the purpose to prevent, obstruct, or delay a public official, (3) that actually hampers or impedes a public official, (4) while the official is acting in the performance of a lawful duty, and (5) the defendant so acts without privilege.'"

*State v. Morris*, 2016-Ohio-8325, 68 N.E.3d 822, ¶ 14 (8th Dist.), quoting *Brooklyn v. Cocksure*, 8th Dist. Cuyahoga No. 98816, 2013-Ohio-2901, ¶ 7, quoting *State v. Rates*, 169 Ohio App.3d 766, 2006-Ohio-6779, 865 N.E.2d 66, ¶ 21 (10th Dist.).

**{¶28}** The state presented evidence that Gardner knew police had overheard his threats to shoot Mosey, her children and the police if they "came out to him" and had disclosed his location to police when asked. Based on that evidence, it could be reasonably inferred that Gardner knew, when the police arrived at Gardner's parents home, that they were there to apprehend him. Officer Lenz and Luther testified that when they arrived at Gardner's parents' house, Gardner was in the front yard, in an "aggressive stance." They stated that Gardner ignored the officers' repeated commands to "get on the ground, show us your hands" and, instead, threw his hands up in the air, screaming, "Come on. Let's do it" and "things of that nature," before retreating into the house.

**{¶29}** Gardner entered the house through the front door then ran out the side door into the backyard where he was again confronted by Officer Lenz. Officer Lenz testified that when he confronted Gardner in the backyard, he told Gardner "several more times to get on the ground" before Gardner complied.

{¶30} Based on the evidence presented, the trial court could have reasonably concluded that Gardner's actions were done "with the purpose to prevent, obstruct, or delay" the police officers' attempts to apprehend him and that his actions, in fact, hampered or impeded those efforts. The evidence does not weigh heavily against Gardner's conviction. The officers' testimony was consistent and credible. It is common sense that Gardner's actions in running from the police — first into the house and then out of the house and into the backyard — instead of complying with the officers' commands to "get on the ground," delayed and hindered his arrest. There is no dispute that the police officers who responded to Gardner's parents' house and attempted to apprehend Gardner were public officials "in the performance of [their] lawful duties" and that Gardner had no "privilege" to act as he did.

**Having Weapons While Under Disability**

{¶31} Although we conclude that there was sufficient evidence to support Gardner's convictions for aggravated menacing and obstructing official business, we find that there was insufficient evidence to support Gardner's conviction for having weapons while under disability.

{¶32} R.C. 2923.13(A)(3) provides, in relevant part:

[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has

been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

Gardner stipulated to a prior drug trafficking conviction.

{¶33} To "have" a firearm within the meaning of R.C. 2923.13(A), a person must have actual or constructive possession of it. *State v. Davis*, 8th Dist. Cuyahoga No. 104221, 2016-Ohio-7964, ¶ 13, citing *State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 19. There was no argument that Gardner had actual possession of the firearm at issue. Accordingly, the trial court had to decide whether Gardner had constructive possession of the gun the police recovered from the fire pit after they apprehended Gardner.

{¶34} Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his or her immediate physical possession. *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976); *State v. Washington*, 8th Dist. Cuyahoga Nos. 98882 and 98883, 2013-Ohio-2904, ¶ 22; *State v. Tucker*, 2016-Ohio-1353, 62 N.E.3d 903, ¶ 21 (9th Dist.); *see also State v. Phillips*, 10th Dist. Franklin No. 14AP-79, 2014-Ohio-5162, ¶ 121 ("'Constructive possession of a firearm exists when a defendant knowingly has the power and intention at any given time to exercise dominion and control over [the] firearm, either directly or through others.'"), quoting *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737,

2005-Ohio-2334, ¶ 32. Although constructive possession of a firearm may be established by reasonable inferences from circumstantial evidence, *see, e.g.*, *Washington* at ¶ 22, it "cannot rest upon mere speculation." *State v. Haynes*, 25 Ohio St.2d 264, 270, 267 N.E.2d 787 (1971).

{¶35} "'[P]ossession of a firearm in violation of R.C. 2923.13 may be inferred when a defendant has exercised dominion and control over the area where the firearm was found.'" *State v. Sebastian*, 4th Dist. Highland No. 08CA19, 2009-Ohio-3117, ¶ 35, quoting *State v. Pitts*, 4th Dist. Scioto No. 99CA2675, 2000 Ohio App. LEXIS 5211, *27 (Nov. 6, 2000). However, "[c]onstructive possession cannot be inferred by a person's mere presence in the vicinity of contraband" or "mere access" to contraband or to the area in which contraband is found. *State v. Jansen*, 8th Dist. Cuyahoga No. 73940, 1999 Ohio App. LEXIS 2060, *8 (May 6, 1999); *State v. Burney*, 10th Dist. Franklin No. 11AP-1036, 2012-Ohio-3974, ¶ 22-24, 32 (where multiple people were connected to house during the time period at issue "defendant's occupancy alone [was] insufficient to support an inference of possession, meaning the 'state is required to adduce additional other evidence to establish possession'"), quoting *State v. Hall*, 8th Dist. Cuyahoga No. 66206, 1994 Ohio App. LEXIS 5391, *5 (Dec. 1, 1994); *see also Tucker* at ¶ 22-27 (observing that the principle that "access to a weapon can establish possession * * * does not stand in a vacuum" and that there must be other evidence establishing a connection between the defendant and the weapon to support a conviction for having a weapon while under disability). To establish constructive possession, there must be some evidence

that the person exercised or had the power to exercise dominion and control over the object. *See, e.g., State v. Long*, 8th Dist. Cuyahoga No. 85754, 2005-Ohio-5344, ¶ 17, 20 (observing that "Ohio courts have routinely held that constructive possession can be established by the fact that a defendant had access to a weapon and had the ability to control its use"). It must also be shown that the person was "conscious of the presence of the object." *State v. Hankerson*, 70 Ohio St.2d 87, 91, 434 N.E.2d 1362 (1982); *Washington*, 2013-Ohio-2904, at ¶ 22; *see also State v. Bray*, 8th Dist. Cuyahoga No. 92619, 2009-Ohio-6461, ¶ 21 ("[W]hether a person charged with having weapons while under disability knowingly acquired, had, carried, or used any firearm or dangerous ordnance 'is to be determined from all the attendant facts and circumstances available.'"), quoting *State v. Teamer*, 82 Ohio St.3d 490, 492, 696 N.E.2d 1049 (1998).

{¶36} The state argues that Gardner's proximity to the gun at the time he was apprehended combined with (1) the evidence of his prior threats to shoot Mosey, her children and the police and (2) Mosey's testimony that Gardner had previously stored a gun in his parents' backyard, supports the inference that Gardner was attempting to access the firearm at the time he was apprehended, establishing constructive possession. We disagree. Following a thorough review of the record and viewing the evidence in the light most favorable to the state, we cannot say that the state met its burden of establishing, beyond a reasonable doubt, that Gardner had dominion and control over and was conscious of the presence of the firearm police recovered from the fire pit in Gardner's parents' backyard.

{¶37} The gun at issue — a .22 caliber black revolver with a white or ivory handle — was found "tucked under" the fire pit. The gun was discovered when police conducted a search of the area after they apprehended Gardner.

{¶38} Although there were some similarities between the two, Mosey's description of the gun she saw in Gardner's possession sometime prior to the incident did not match that of the gun recovered by police after Gardner was apprehended.

{¶39} Mosey testified that she had previously seen Gardner with a handgun but that she did not know what type of handgun it was and could not state what color it was, what size it was, whether it was "big, little [or] long." All she knew was that the gun had "the spinny thing, where you put the bullets in." She did not testify as to where she had previously seen Gardner with the gun or when she had seen Gardner with the gun, only that it was "a while ago." Mosey did not testify at trial regarding where Gardner kept or stored the gun.

{¶40} Officer Ashley Jaycox testified that when she interviewed Mosey on the night of the incident, Mosey told her that she had seen Gardner with a gun "about a month prior," which Mosey described as a silver and black .38 caliber revolver, and that Gardner "would store" this gun "in the backyard, in the vicinity between a parked car and a fire pit."

{¶41} During Mosey's testimony, the state showed her a photograph of the fire pit and asked her to point out the gun shown in that photograph. Mosey identified what she described as a black gun with a white handle. She could not state whether that gun was

the gun she had previously seen in Gardner's possession.   She was not asked about her prior statements to Officer Jaycox and did not testify that this was the location in which Gardner had stored the gun she had previously seen in his possession.

{¶42} Although Officer Luther testified that the gun was recovered "less than three feet away" from where Gardner was apprehended,[3] he did not enter the backyard until Officer Lenz had Gardner on the ground, at gunpoint.   It was Officer Lenz who observed and interacted with Gardner after Gardner exited the house and entered the backyard.   Officer Lenz testified that when he first "made visual contact" with Gardner, Gardner was "10, 15 feet maybe" from the fire pit.   While Gardner was "still approaching," Officer Lenz held him at gunpoint and told him, several times, to get on the ground.   Officer Lenz testified that when Gardner dropped to his knees, he reached towards his own body, away from the fire pit, "towards like, either his waistband or his jacket pocket."   Gardner then complied fully with the officer's directive and laid on the ground.

{¶43} Gardner did not live with his parents at that time; he had lived with Mosey and had been living with her continuously for a year.   The fire pit was in an outdoor common area to which numerous people had access.   When asked whether she had previously seen Gardner "in that area," Mosey responded that she had "see[n] everybody

---

[3]Officer Luther was not the officer who discovered the firearm.   He testified that another officer, whom he did not identify, discovered the firearm when "checking the area" after Gardner was apprehended.   It does not appear that this officer was one of the officers who testified at trial.

in that area" because "[i]t's the backyard of their house." More than a dozen people were at Gardner's parents' home when police arrived looking for Gardner.

{¶44} There was no evidence that Gardner, at any point, reached towards or in the direction of the fire pit or was otherwise so close to the gun during his interaction with Officer Lenz that he could have exercised dominion and control over it. The gun was not in plain view or otherwise readily accessible to Gardner; it was hidden, tucked inside the base of the fire pit. Officer Luther could not state whether the gun was loaded. Although the gun was analyzed for fingerprints, Detective Reeves testified that "[n]o latent prints of value were detected."

{¶45} At most, the state's evidence establishes that Gardner was in the vicinity of the gun, which is not sufficient to establish constructive possession. *See, e.g., Burney*, 2012-Ohio-3974, at ¶ 22, 29, 32 (where multiple persons had access to house and gun was found hidden under furniture in the house's common area, state presented insufficient evidence that defendant knowingly possessed or exercised dominion or control over weapon); *State v. Wingfield*, 2014-Ohio-2053, 11 N.E.3d 732, ¶ 22-25 (8th Dist.) (state failed to present sufficient evidence that defendant exercised dominion and control over gun that was found on a store shelf in an area accessible to the public where police officer testified that he saw defendant next to counter where the gun was found, there had been a lot of customer traffic in the store that day and no fingerprints were found on the gun); *compare State v. Hawthorne*, 8th Dist. Cuyahoga No. 89345, 2008-Ohio-1815, ¶ 16-22 (evidence was sufficient to establish that defendant had constructive possession of assault

rifle where defendant was alone in the house, asleep in his daughter's bedroom, with the loaded weapon laying next to him in the bed).

{¶46} Accordingly, we find that the state did not present sufficient evidence of actual or constructive possession to support Gardner's conviction for having a weapon while under disability. Gardner's first assignment of error is sustained in part and overruled in part. Gardner's second assignment of error is affirmed as to his convictions for aggravated menacing and obstructing official business and moot as to his conviction for having weapons while under disability.

**Costs**

{¶47} In his third assignment of error, Gardner contends that the trial court erred by ordering him to pay court costs in its sentencing journal entry that it did not impose at the sentencing hearing.

{¶48} R.C. 2947.23(A)(1) governs the imposition of court costs. It provides that "[i]n all criminal cases * * * the judge * * * shall include in the sentence the costs of prosecution * * * and render a judgment against the defendant for such costs." R.C. 2947.23(A)(1). However, in its discretion, a trial court may waive court costs if the defendant is indigent.

{¶49} Crim.R. 43(A) states that a criminal defendant must generally be present at every stage of his or her criminal proceeding, including sentencing. *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, ¶ 22. In *Joseph*, the Ohio Supreme Court held that it was reversible error under Crim.R. 43(A) for a trial court to order the

payment of costs in its sentencing journal entry that it did not impose at the sentencing hearing. *Id.* The court held that, in such cases, a defendant is harmed because he is "denied the opportunity to claim indigency and to seek a waiver of the payment of court costs before the trial court." *Id.* The court determined that the remedy in such cases is a limited remand to the trial court to allow the defendant to seek a waiver of the payment of court costs. *Id.* at ¶ 23.

**{¶50}** The state concedes that "it was error for the trial court to order costs in its judgment entry without first orally notifying Appellant of the court costs on the record." However, it contends that the error is harmless because "Appellant may, at any time[,] claim indigency and ask the trial court to waive court costs" under R.C. 2947.23(C). Effective March 22, 2013, R.C. 2947.23 was amended such that the trial court now "retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution * * * at the time of sentencing or at any time thereafter." R.C. 2947.23(C).

**{¶51}** Since R.C. 2947.23(C) was amended, this court and others have continued to apply *Joseph* and have found reversible error where the trial court imposed court costs in the sentencing journal entry that were not imposed at the sentencing hearing. *See, e.g., State v. Potts*, 8th Dist Cuyahoga No. 104482, 2017-Ohio-4435, ¶ 60-64; *State v. Martin*, 8th Dist. Cuyahoga No. 104354, 2017-Ohio-99, ¶ 33-37; *State v. Elder*, 8th Dist. Cuyahoga No. 104392, 2017-Ohio-292, ¶ 31-34; *State v. Rudd,* 8th Dist. Cuyahoga No. 104567, 2016-Ohio-106, ¶ 84-88; *State v. Kirby*, 9th Dist. Summit No. 27986, 2016-Ohio-8138, ¶ 11-14; *State v. Norris*, 9th Dist. Summit No. 27630, 2016-Ohio-1526,

¶ 23-25; *State v. Geary*, 1st Dist. Hamilton No. C-160195, 2016-Ohio-7001, ¶ 42, 43-46; *State v. Pennington*, 5th Dist. Guernsey No. 16CA14, 2017-Ohio-1423, ¶ 22-28; *State v. Sizemore*, 5th Dist. Richland No. 15CA18, 2016-Ohio-1529, ¶ 35*; State v. Jones*, 6th Dist. Lucas No. No. L-16-1014, 2017-Ohio-413, ¶ 39-44; *State v. Rigsby*, 12th Dist. Butler No. CA2016-06-121, 2017-Ohio-329, ¶ 4-6. *But see State v. Thomas*, 8th Dist. Cuyahoga No. 104567, 2017-Ohio-4436.

{¶52} In *Potts*, a divided panel of this court, following *Joseph* and *Elder*, reversed the portion of the trial court's judgment that imposed court costs that were not imposed at the sentencing hearing and remanded the matter to allow the defendant to move for a waiver of the payment of court costs. *Potts* at ¶ 63-64. In that case, the defendant did not file a postsentence motion to waive court costs under R.C. 2947.23(C), but filed a postsentence motion to establish a payment schedule of $10 per month and had made several payments towards costs. *Potts* at ¶ 68 (Stewart, J., concurring in part and dissenting in part). The dissent acknowledged the trial court's error in failing to advise the defendant at the sentencing hearing that he had to pay court costs, but asserted the error was harmless because R.C. 2947.23(C) "makes reliance on [*Joseph*] improper." *Id.*

{¶53} A week later, in *Thomas*, another divided panel of this court held that because the trial court retains jurisdiction over the defendant's court costs under R.C. 2947.23(C), "the protection established by the Supreme Court's decision in *Joseph* is no longer necessary" and that the trial court's error in failing to impose court costs at the

sentencing hearing did not prejudice the defendant and was harmless. *Id.* at ¶ 7-15. In that case, the defendant had filed a "motion to vacate/waive courts costs and fines or implement a payment plan upon release pursuant to R.C. 2947.23" after he filed his notice of appeal. *Id.* at ¶ 14. The dissent disagreed, noting that "*Joseph* has not been overruled," citing the "plethora of cases" that have continued to hold, "pursuant to *Joseph* * * * that it is reversible error under Crim.R. 43(A) for the trial court to impose court costs in its sentencing entry when it did not impose those costs in open court at the sentencing hearing" and disagreeing with the majority's conclusion that a defendant "suffers no prejudice when the trial court imposes court costs in his or her absence." *Id.* at ¶ 18-19 (Keough, A.J., concurring in part and dissenting in part).

{¶54} Although R.C. 2947.23 was amended after the Ohio Supreme Court decided *Joseph*, such that the trial court now "retains jurisdiction" under R.C. 2947.23(C) "to waive, suspend, or modify the payment of the costs of prosecution * * *at the time of sentencing or at any time thereafter," the fact remains that (1) the trial court imposed costs in its sentencing journal entry that it did not impose in open court at the sentencing hearing and (2) Gardner did not have any opportunity to seek a waiver of payment of costs while he was represented by counsel at the sentencing hearing. The possibility that this error could be "fixed" if the defendant were to file a proper postconviction motion, seeking a waiver of payment of the improperly imposed court costs under R.C. 2947.23(C), does not, in and of itself, render the error harmless. *See State v. Norris*, 9th Dist. Summit No. 27630, 2016-Ohio-1526, ¶ 23-25 (although recognizing that R.C.

2947.23(C) permits a trial court to address issues with court costs after sentencing, holding that the defendant was nevertheless harmed when he was "'denied the opportunity to claim indigency and to seek a waiver of the payment of court costs before the trial court'"), quoting *Joseph* at ¶ 22; *see also State v. Brown*, 8th Dist. Cuyahoga No. 103427, 2016-Ohio-1546, ¶ 15 (observing that "strategic timing may now play a role" in deciding whether to seek a waiver of court costs at the sentencing hearing under R.C. 2947.23(C)); R.C. 2947.23(A)-(B) (authorizing trial court to order a criminal defendant to perform community service to satisfy judgment for costs).

**{¶55}** Nevertheless, we need not resolve the apparent conflict between the *Potts* line of cases and *Thomas*, because we find that, in this case, the costs issue has been rendered moot.   On March 14, 2017, the trial court issued a journal entry which states in relevant part: "Clerk of courts to credit this defendant with having satisfied all fines, fees and court costs in this case through performance of community service."

**{¶56}** Gardner's third assignment of error is overruled as moot.

**{¶57}**   Judgment affirmed in part; reversed in part; remanded.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

LARRY A. JONES, SR., J., CONCURS;
MELODY J. STEWART, J., CONCURS  IN JUDGMENT ONLY IN PART AND
DISSENTS IN PART (SEPARATE OPINION ATTACHED)


MELODY J. STEWART, J., CONCURRING IN JUDGMENT ONLY IN PART, AND
DISSENTING IN PART:

{¶58} I concur in the judgment reached by the majority with all but the disposition of Gardner's assignment of error relating to sufficiency of the evidence supporting his conviction for having a weapon while under disability.  Viewing the facts most favorably to the state, I conclude that a rational trier of fact could conclude from the circumstantial evidence that Gardner constructively possessed the firearm.

{¶59} In his telephone call to the girlfriend, Gardner told her that "I'm about to come shoot you and your kids."  After the girlfriend told Gardner that the police were with her and listening in on the telephone call, he replied that he "got one for them, too." A police officer identified himself to Gardner.  Gardner continued to make threats, saying that if the police came to find him, he would shoot them.  As the police left to apprehend Gardner, the girlfriend told an officer that Gardner not only owned a gun, but kept it in the backyard of his father's house, near a fire pit.  The police responded to the father's house with weapons drawn, ordering Gardner to the ground.  An intoxicated Gardner refused, and taunted them by saying "come on, come on."  He then ran into the house.  One officer followed him; the other officer ran around to the back of the house.

Gardner emerged from the house into the back yard, within arm's reach of a fire pit ("less than three feet away"). An officer intercepted Gardner and ordered him to the ground. After Gardner was arrested, the police found a firearm stashed inside the fire pit.

{¶60} From these facts, a rational trier of fact could infer that Gardner was running toward the fire pit with the intention of retrieving the gun. Importantly, the facts proved that the girlfriend not only correctly said that Gardner owned a firearm, but that he kept the gun outside of his father's house near the fire pit. The path that Gardner took when running from the police placed him just a few feet from where the firearm was found. Gardner was plainly trying to elude the police and he took a path that led him to the very spot where the police had been told the firearm was hidden. Given that Gardner had threatened to shoot the police and was belligerent when they responded to the house, a rational trier of fact could find his actions consistent with those of a person who constructively possessed the firearm.

{¶61} The majority observes that the girlfriend's description of the gun did not exactly match the gun found in the fire pit. For purposes of a sufficiency of the evidence review, those inconsistencies are immaterial. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence). What was material was that the girlfriend correctly told the police that Gardner had access to a gun and correctly stated where the gun could be found.

**{¶62}** The majority also observes that Gardner did not live with his parents, suggesting that the gun could have belonged to another family member. But that observation is likewise immaterial because the state does not have to prove ownership when establishing constructive possession. *State v. Davis*, 8th Dist. Cuyahoga No. 104221, 2016-Ohio-7964, ¶ 14. And constructive possession can be shown by the exertion of dominion or control over an object, even if that object is not within a person's immediate physical possession. *State v. Jones*, 8th Dist. Cuyahoga No. 101311, 2015-Ohio-1818, ¶ 46.

**{¶63}** The majority's argument that there was no evidence that Gardner was seen reaching for the firearm is refuted by well-established precedent that constructive possession can be inferred when the object "is within easy reach." *State v. McPherson*, 8th Dist. Cuyahoga No. 63168, 1993 Ohio App. LEXIS 3721, 6 (July 29, 1993); *see also State v. Byers*, 8th Dist. Cuyahoga No. 94922, 2011-Ohio-343, ¶ 6. Viewing the testimony most favorably to the state showed that Gardner, who had just threatened to shoot his girlfriend, her children, and the police, was apprehended within three feet of the fire pit where the girlfriend specifically told police Gardner kept a weapon hidden. Based on these facts, I find that the state presented sufficient evidence that Gardner was in constructive possession of a weapon while under disability.