[Cite as *State v. Geralds*, 2025-Ohio-2209.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240512 |
| | | TRIAL NO. B-2304290 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| DONNELL GERALDS, | : | *JUDGMENT ENTRY* |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, the briefs, and the arguments.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/25/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *State v. Geralds*, 2025-Ohio-2209.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                   :        APPEAL NO.  C-240512
                                          TRIAL NO.   B-2304290
    Plaintiff-Appellee,     :

  vs.                            :

DONNELL GERALDS,                 :          *O P I N I O N*

    Defendant-Appellant.    :



Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 25, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Candace Crear*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *Elizabeth Conkin*, for Defendant-Appellant.

**Zayas, Judge.**

**{¶1}** Donnell Geralds appeals his conviction for having weapons while under a disability. In three assignments of error, Geralds contends his trial counsel was ineffective for failing to file a motion to suppress, the evidence was insufficient to support the conviction, and his conviction was against the weight of the evidence. For the following reasons, we affirm the judgment of the trial court.

### Factual Background

**{¶2}** On September 7, 2023, Geralds was indicted for having weapons while under a disability ("WUD"). The indictment listed the weapon as "a firearm" and included a forfeiture specification alleging that Geralds possessed a Glock and/or a FN firearm and/or a Derringer. The case proceeded to a bench trial, and the parties stipulated that the prior offense that created the disability was the 2009 conviction for trafficking in heroin in the case numbered B-080706.

**{¶3}** According to the State's opening statement, "the electronic monitoring officers arrived at [Geralds] home on August 30, 2023, when they effectuated a routine, random search on the house." During this search, the officers discovered drugs and three firearms.

**{¶4}** Probation Officer Kenzi Beall testified that she works for the Hamilton County Adult Probation Department with the electronic monitoring unit ("EMU"). Beall supervised pretrial and probation cases that had a bond or a condition of EMU. Beall had supervised Geralds during his pretrial release on a separate case involving multiple trafficking and possession charges and a WUD charge. Geralds had been released on bond in that case.

**{¶5}** Beall testified that while supervising Geralds on EMU, she initiated a routine home visit at his home. When she conducts home visits, she generally moves

all occupants of the home to a central location in the home and conducts a plain-view search.

{¶6} On that day, Geralds took "an unusual amount of time to answer the door. The smell of marijuana was present as well through the door." When Geralds answered the door, he informed her that he was home alone. Beall had him sit on the couch, and she remained with him while Officers Taylor and Seig went to Geralds's bedroom. At some point, Taylor returned, placed Geralds in custody, and read him his *Miranda* rights. Taylor informed Geralds that a Derringer was found in his dresser drawer. Geralds acknowledged the firearm and explained the gun was for protection.

{¶7} Officer Seig continued to search and located a Glock .40 inside a cabinet in the dining room. After the second gun was found, Beall called District 4 and requested assistance. District 4 dispatched officers who assisted in the search. Geralds's son's bedroom was searched because Beall had prior information from Geralds that his son had a gun. No firearm was found in the son's bedroom. A search was also done in the spare bedroom which was used as a closet by Geralds and his wife. An FN firearm was located in the spare bedroom.

{¶8} After Geralds's arrest, Beall had listened to a jail phone call between Geralds and his wife. His wife asked Geralds if there was anything on "that extra gun," and he responded, "I don't know." She asked if there were "any bodies on that," and he said, "Hello." Then she responded, "Yeah, that – that gun I bought off the street." He stated "shouldn't be, no." The call occurred on the day of Geralds's arrest.

{¶9} On cross-examination, Beall testified that she had searched the home before, but at that time, a plain-view search did not reveal any illegal items. Beall further explained that at a prior home visit, she had established where Geralds's bedroom and dresser were located within the home.

**{¶10}** Beall's business card was attached to the dresser mirror in Geralds's bedroom, which indicated to Beall that he had access to the dresser and the firearm. The firearm was found in a drawer that contained male socks. Beall described the socks as long socks typically worn by men and "Under Armor" socks that looked masculine, but she did not know to whom the socks belonged. The Under Armor socks were long, athletic socks, typically worn by men. Beall also observed multiple fragrances on the top of the dresser. The right side appeared to contain men's cologne, and the other side appeared to have women's perfume.

**{¶11}** Beall testified that Geralds was aware that he was "responsible to ensure that every firearm was out of that home before he was placed on EMU." She further testified that Geralds had signed a document that stated he was the homeowner or renter, and because Geralds was the homeowner or renter, Beall assumed he had control over what happened in the home.

**{¶12}** Officer Nathaniel Seig, also an EMU probation officer, testified that he also monitored individuals on EMU. During a home visit, Seig ensures that an individual on EMU does not possess guns, drugs, or other contraband, and the person is abiding by the EMU rules. Seig had previously met Geralds during a home visit.

**{¶13}** Seig had accompanied Beall during the random check-in and testified that Geralds took a couple of minutes to answer the door and confirmed the odor of marijuana. When Seig went upstairs, he saw a bag of marijuana hanging from the nightstand next to Geralds's bed. Seig found a Derringer in a sock drawer in the bedroom dresser. The bed was unmade with gray sheets, pillows, and comforter. A pair of what appeared to be very large, male, athletic socks was also on the bed. Seig continued to search the bedroom, but found no additional contraband.

**{¶14}** Seig located a Glock box in a cabinet in the dining room. Seig reviewed

5

a photograph of the opened box taken in the dining room that day. Seig testified that the box contained a loaded Glock 30. A third firearm was found in a bag in the closet in the spare bedroom.

{¶15} Seig confirmed that fragrances were on the dresser, and the woman's cologne was on the left. The sock drawer was on the left side of the dresser. Seig believed the socks in the drawer were male socks. Seig testified that the closet where they located the third gun contained both male and female items. The gun was well-hidden, in a bag within a bag in the back of the closet.

{¶16} Officer Nicholas DeZarn, from the violent crime squad of Cincinnati Police Department's ("CPD") District 4, testified that he responded to Geralds's home after receiving a call from Beall. DeZarn assisted with the search of the closet, which resulted in the discovery of an FN 57 handgun. After the firearms were recovered, Officer Grant Perry test fired the guns to determine operability.

{¶17} DeZarn testified that he listened to the sole jail call Geralds made to his wife on the day of his arrest. DeZarn testified that his wife was asking whether any bodies could be tied to the gun purchased from the street, and Geralds responded that there shouldn't be. DeZarn had requested a DNA analysis on the guns found in Geralds's home. The test results were either "there were too many profiles or inconclusive."

{¶18} CPD officer Grant Perry testified that he responded to Geralds's home when the search was concluding. Perry processed and test fired the guns found in the home. All of the firearms were operable. The Glock semi-automatic was loaded with ten rounds of a magazine when it was recovered.

{¶19} The State rested, and Geralds called his wife to testify. Geralds's wife testified that she owned the home on Rutledge, and lived there with her husband

6

Geralds and her adult son. Geralds's wife testified that she was aware of his criminal history and knew he was not supposed to be around guns. She testified that all of the guns belonged to her, and she kept one, the Derringer, in her sock drawer. Geralds's wife had purchased the FN gun in the closet at a swap meet, but she no longer used that gun, so she put it in the closet. The Glock in the dining room was usually kept in her truck, but that day, she had to go to court and then take the truck to be serviced. She did not want to leave the gun in the truck while it was being serviced, so she put it in a drawer in the dining room. The gun was in a case, and she believed she had locked the case. She did not tell Geralds that the gun was in the dining room because he was asleep when she left. Geralds's wife admitted that the two shared the dresser.

{¶20} After Geralds's wife testified, the defense rested, and the court took the matter under advisement. The court found Geralds guilty of having the Derringer and the Glock.

{¶21} At the sentencing, in mitigation, defense counsel acknowledged Geralds's two prior convictions for having weapons under disability and asked for probation because he had successfully completed supervised release in the past. Defense counsel also stated, "I still have some suspicions on why the house was searched that day, but I can't prove it." The State sought a maximum sentence due to Geralds's prior eight felony convictions. At the time of the offense, he had pending drug charges and a WUD charge in Hamilton County.

{¶22} The trial court noted that the "probation department determined you are a high risk to reoffend according to your ORAS score, it's my understanding that you're now on probation in [Kentucky] for not an offense related to this offense, but for a drug-related offense." At the time of this offense, the Kentucky charges had not been resolved. The court sentenced him to 24 months' incarceration.

7

### Ineffective Assistance of Counsel

{¶23} In his first assignment of error, Geralds contends his trial counsel provided ineffective assistance of counsel by failing to file a motion to suppress the evidence discovered as a result of the warrantless search. Geralds argues that the State induced him to waive his right to be free from unreasonable searches in exchange for community-control release pending resolution of his case in violation of the Fourth Amendment.

{¶24} To establish ineffective assistance of counsel, Geralds must show (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶25} "Failing to file a motion to suppress does not constitute ineffective assistance of counsel per se." *State v. Brown*, 2007-Ohio-4837, ¶ 35. "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *State v. Adams*, 2004-Ohio-5845, ¶ 35. "Thus, the failure to file a motion to suppress constitutes ineffective assistance of counsel only when the record establishes that the motion would have been successful if made." *State v. Rosemond*, 2019-Ohio-5356, ¶ 34 (1st Dist.), citing *In re M.E.*, 2015-Ohio-3663, ¶ 7 (1st Dist.).

{¶26} "However, even when some evidence in the record supports a motion to suppress, we presume that defense counsel was effective if 'the defense counsel could reasonably have decided that the filing of a motion to suppress would have been a futile act.'" *Id.*, citing *State v. Edwards*, 1996 Ohio App. LEXIS 3033, *2 (8th Dist.

July 11, 1996), citing *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1982).

**{¶27}** Geralds contends that the State unconstitutionally induced him to waive his Fourth Amendment right to be free from unreasonable searches and seizures in exchange for pretrial release. Because the search was not challenged at the trial court, the record is almost devoid of information regarding the basis of the search.

**{¶28}** The record in this case reflects that Beall was supervising Geralds on EMU in an unrelated case, and that Geralds knew "he [was] responsible for making sure every firearm was out of that home before he was placed on EMU." Beall was not asked to clarify what this meant or where this responsibility is rooted. Beall reviewed a document signed by Geralds representing that he was the homeowner or renter of the home, but that document was not admitted into evidence. The record does not reflect what document Beall was reviewing or the contents of that document.

**{¶29}** Seig testified that during a home visit, he ensures individuals on EMU do not possess guns, drugs, or other contraband. But beyond this testimony, Seig is not asked to explain under what authority he was acting or under what authority he conducted a search that went beyond a plain-view search.

**{¶30}** Although in this appeal, Geralds appears to acknowledge that he agreed to certain conditions in exchange for pretrial release, he does not point to where and how he agreed to these conditions. Further, he now contends that any such condition granting consent to search his home was involuntary and coerced by the State as a condition of pretrial release.

**{¶31}** However, Geralds never raised this issue before the trial court, never moved to include the document(s) relied on for this issue, and the record before this court does not contain any documents that Geralds signed or clear evidence that Geralds was coerced into signing the purported documents. Additionally, Geralds

does not raise error for trial counsel's failure to include the document in the record during the trial court proceedings. Because a motion to suppress was not filed, the record contains very little evidence regarding the nature of the search.

{¶32} "Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion." (Citations omitted.) *Rosemond* at ¶ 41. *See* App.R. 16(A)(7) (requiring the appellant to reference "the parts of the record on which appellant relies."). Although the waiving of Fourth Amendment rights during pretrial detention is concerning, without the documents that Geralds signed, this court cannot reach the merits of the assignment of error. Thus, this court cannot determine whether a motion to suppress would have been successful. *See id.*

{¶33} Accordingly, Geralds has failed to establish that his counsel was ineffective for failing to file a motion to suppress and that his constitutional rights were violated. *See id.* We overrule the first assignment of error.

## Sufficiency of the Evidence

{¶34} Next, Geralds argues that his conviction was not supported by sufficient evidence.

{¶35} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000). "[T]he question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt." *State v. Ham*, 2017-Ohio-9189, ¶ 19 (1st Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), paragraph two of the syllabus.

**{¶36}** Geralds was convicted of violating R.C. 2923.13(A)(3), which states, in relevant part

> [N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply: (3) The person . . . has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse . . . ."

**{¶37}** Geralds contends that the State failed to prove that he had the firearms found in his bedroom dresser and the dining room. To "have" a firearm means that the offender has "actual or constructive possession of the gun." *State v. Philpott*, 2020-Ohio-5267, ¶ 45 (8th Dist.), citing *State v. Gardner*, 2017-Ohio-7241, ¶ 33 (8th Dist). "A person is in 'constructive possession' if he is able to exercise dominion and control over an item, even if he does not have immediate physical possession of it." *State v. DeVaughn*, 2020-Ohio-651, ¶ 32 (1st Dist.), citing *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus, and *State v. Jenks*, 61 Ohio St.3d 259 (1991), syllabus.

**{¶38}** Constructive possession may be demonstrated through circumstantial evidence. *See State v. English*, 2010-Ohio-1759, ¶ 32 (1st Dist.). "But a person's mere presence in the vicinity of a firearm, alone, does not create an inference of constructive possession. Rather, constructive possession may be inferred from a combination of facts, such as an awareness of a firearm that is within easy reach." (Citations omitted.) *State v. Hicks*, 2023-Ohio-2209, ¶ 10 (1st Dist.). Possession of a firearm may be inferred when a defendant has exercised dominion and control over the area where the firearm was found. *Gardner* at ¶ 35.

**{¶39}** Geralds argues that the State failed to meet its burden because the Derringer was hidden in his wife's sock drawer, and there was no evidence that Geralds

knew the Derringer was in the drawer.

**{¶40}** However, Beall testified that when Geralds was confronted with the gun in the dresser drawer, he acknowledged the gun was in the drawer and stated it was there for protection. Beall had previously established the location of Geralds's bedroom, and Beall's card was attached to the dresser's mirror. Beall further testified that the drawer where the gun was found contained male socks. The dresser was in the bedroom Geralds shared with his wife, and his wife testified that the two shared the dresser.

**{¶41}** Following a thorough review of the record and viewing the evidence in the light most favorable to the State, we cannot say that the State failed to meet its burden of establishing, beyond a reasonable doubt, that Geralds had dominion and control over the dresser and was conscious of the presence of the Derringer in the sock drawer. Therefore, any rational trier of fact could have found the State proved this element of the crime. *See Ham*, 2017-Ohio-9189, at ¶ 19.

**{¶42}** With respect to the sufficiency of the evidence regarding the Glock found in the dining room, Geralds had dominion and control over the dining room as it was a common area in the house. Possession of a firearm may be inferred when a defendant has exercised dominion and control over the area where the firearm was found. *Gardner*, 2017-Ohio-7241, at ¶ 35 (8th Dist.). However, "mere presence or access to contraband or the area where contraband is found is insufficient to demonstrate dominion and control." *Id.* Instead, "[i]t must also be shown that the person was 'conscious of the presence of the object.'" *Id.*, citing *Hankerson*, 70 Ohio St.2d at 91; *State v. Washington*, 2013-Ohio-2904, ¶ 22 (8th Dist.); *State v. Bray*, 2009-Ohio-6461, ¶ 21 (8th Dist.).

**{¶43}** Geralds argues that he could not access the Glock because, as his wife

testified, the gun was in a locked container. However, his wife testified that she thought she had locked the box, and the record reflects that Seig was able to open the box and retrieve a loaded Glock from the box.

**{¶44}** Geralds's wife further testified that she had just placed the gun in the dining room that morning and had not informed Geralds that she had done so. The State presented no argument in its appellate brief regarding the sufficiency of the evidence to establish constructive possession of the Glock. At trial, the State presented no evidence that Geralds was aware of the presence of the Glock in the cabinet in the dining room. The State presented evidence via a jail phone call that Geralds was aware of the gun that was purchased at the swap meet or on the street. Geralds's wife testified that the gun hidden in the closet was the gun purchased at the swap meet and not the Glock. At most, the State established that the gun was located in a common area in the vicinity of Geralds, which is insufficient to establish constructive possession. *See Gardner* at ¶ 45; *State v. Burney*, 2012-Ohio-3974, ¶ 22-24, 32 (10th Dist.) (where multiple people were connected to house during the time period at issue "defendant's occupancy alone [was] insufficient to support an inference of possession, meaning the 'state is required to adduce additional other evidence to establish possession'"), quoting *State v. Hall*, 1994 Ohio App. LEXIS 5391, *5 (8th Dist. Dec. 1, 1994).

**{¶45}** However, the single WUD conviction was based on both firearms. Accordingly, even if the State failed to present sufficient evidence that Geralds knew or was aware of the Glock in the dining room, the WUD conviction is still supported by adequate evidence based on the gun in the dresser drawer.

**{¶46}** We overrule the second assignment of error.

### Manifest Weight of the Evidence

**{¶47}** In his third assignment of error, Geralds asserts that his conviction was

13

against the weight of the evidence.

**{¶48}** In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* "Although an appellate court may review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily an initial determination for the trier of fact." *State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24.

**{¶49}** Geralds contends that the manifest weight of the evidence did not support that he was aware of the Derringer because it was hidden in his wife's drawer. Gerald's own statements established that he knew the Derringer was in the sock drawer. Moreover, to the extent that Geralds is arguing that the trial court should have found his wife's testimony to be credible, the trial court was in the best position to determine the credibility of each witness, and we cannot conclude this record presents a scenario where the court clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

**{¶50}** Having found that the evidence was insufficient to prove constructive possession of the Glock, this assignment of error is moot with respect to the Glock. Even if the trial court did not believe his wife's testimony, the State presented no evidence that Geralds was aware of the Glock in the dining room.

**{¶51}** We overrule the third assignment of error.

## Conclusion

**{¶52}** Having overruled Geralds's three assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**KINSLEY, P.J.,** and **NESTOR, J.,** concur.

15