[Cite as *State v. Thompson*, 2025-Ohio-4359.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-240446 |
| | | TRIAL NO. | B-2203847 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ANTHONY THOMPSON, | : | *JUDGMENT ENTRY* | |
| Defendant-Appellant. | : | | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed and the appeal is dismissed in part.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 9/17/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Thompson*, 2025-Ohio-4359.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                              :          APPEAL NO.   C-240446
                                                      TRIAL NO.    B-2203847
    Plaintiff-Appellee,             :

  vs.                                      :          *O P I N I O N*

ANTHONY THOMPSON,                          :

    Defendant-Appellant.            :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part and Appeal Dismissed in Part

Date of Judgment Entry on Appeal: September 17, 2025


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Bryan R. Perkins*, for Defendant-Appellant.

**Zayas, Presiding Judge.**

{¶1} Anthony Thompson appeals his convictions for two counts of trafficking in a fentanyl-related compound, trafficking in cocaine, and having weapons while under a disability ("WUD"). For the following reasons, we affirm the judgment of the trial court and dismiss the appeal in part.

## Factual Background

{¶2} Thompson was indicted for multiple drug-trafficking and possession charges and a WUD charge after a police investigation prompted by a confidential informant ("CI"). Thompson was initially represented by hired counsel who had scheduled the matter for a negotiated guilty plea to two charges and a sentence of three years. At the plea hearing, Thompson decided not to plead, and the matter was scheduled for trial.

{¶3} At the next hearing, the court noted that Thompson, who was represented by counsel, had filed multiple pro se motions, including a "mandatory judicial notice," and a request to represent himself. The court struck the pro se pleadings. Prior to the hearing, Thompson's counsel had requested an unredacted copy of the affidavit in support of the search warrant that included the dates of the prior drug sales to ensure the information in the affidavit was not stale. The prosecutor represented that there were several drug transactions over several months, and the most recent sale was within 72 hours of the issuance of the warrant.

{¶4} Thompson informed the court that he had fired his retained counsel and wished to represent himself. The court allowed retained counsel to withdraw, appointed new counsel, and scheduled a hearing to determine if Thompson's waiver of counsel was knowing, intelligent, and voluntary. Thompson objected to the hearing, stating, "Judge, I don't really consent. And I don't really understand, because I have

questions. Like one of my questions I want to know first, under what jurisdiction of how this court operates first." The court informed him that he could ask questions when his motion to proceed pro se was granted.

{¶5} At the waiver hearing, the trial court's initial attempt to question Thompson about his decision to represent himself was interrupted by Thompson's questioning the court about its authority to question him and his insistence that he was a beneficiary and not "Mr. Thompson." The court informed him that it had jurisdiction to hear the case under state law. Thompson refused to answer the court's questions and continued to inform the court that he did not accept or consent to the proceedings and demanded to know whether there was a corpus delecti or a victim and reserved his rights under UCC 1-308. Recognizing the futility of the hearing due to Thompson's repeated interruptions and refusal to answer the court's questions, the prosecutor requested the court to order a competency evaluation to determine if Thompson understood the nature of the charges and court proceedings. The court denied Thompson's request to represent himself and scheduled a competency hearing.

{¶6} At the competency hearing, Thompson's appointed counsel stipulated to the Court Clinic's finding that Thompson was competent. After the State stipulated to the report, the court found Thompson competent and the matter was continued for a motion to suppress.

{¶7} Thompson renewed his request to represent himself, and the court explained it had denied his previous request because "Mr. Thompson was not answering my questions. If I don't get an answer to the question, I can't make a determination that he is making a knowing, intelligent, and voluntarily waiver of his right." Thompson's counsel informed the court that the State would be giving him an unredacted affidavit so he could decide whether to file a motion to suppress.

4

{¶8}  At the next hearing, Thompson's counsel informed the court that after reviewing the search-warrant affidavit, the underlying evidence contained in the affidavit, conversing with the investigating officer, and conducting extensive research, he determined that a motion to suppress was not appropriate.

{¶9}  At the following hearing, the State requested that Thompson stipulate to the prior conviction that served as the predicate for his disability.  The court noted that Thompson continued to file motions and struck two from the record.  Based on the content of the motions and conversations with Thompson, Thompson's second counsel moved to withdraw from the case because the attorney-client relationship had eroded, and Thompson wished to fire him.  The court granted the motion, and the court appointed counsel for Thompson.  Thompson repeatedly objected to new counsel and requested "to exercise [his] constitutional right to represent [himself.]"  The court explained that it had already determined that issue.  Thompson replied, "You removed that from the bench.  You removed that from the bench.  I recommend legal determination from the bench to make that."  The court continued the case for another pretrial hearing.

{¶10}  Thompson's appointed counsel filed a motion to withdraw and informed the court that Thompson wished to proceed pro se.  Counsel explained that Thompson was "very consistent in desire of self-representation."  Counsel assured the court that Thompson understood the charges and the potential penalties.  Counsel stated that he had met with Thompson four times and discussed the legal issues, the evidence against him, and his ability to represent himself.

{¶11}  The court explained to Thompson that,

I think, under the constitution, Mr. Thompson -- and we've been through this.  We've had a discussion about you representing yourself

in the past. And I asked you a lot of questions to make sure that you understood your rights.

You have the equal right to have a lawyer and to not have a lawyer. Currently you have a lawyer.

I've tried to engage you and ask you if you understood all of the consequences of representing yourself. And I think I asked you about half an hour's worth of questions and you would not answer me.

And so for you -- for me to be confident that you are making a knowing, intelligent and voluntary waiver of your right to counsel, I have to make sure you know that before I will allow your attorney to withdraw and you can represent yourself.

So since you were not able to answer those questions when I asked them several months back, I'm going to have [your counsel] ask them. State the -- starting with stating the consequences if you're found guilty on all counts, talk about mitigation, explain to you the difference between his representing you and you representing yourself. He's an attorney and you're not. He has vast experience and you have none.

If he can convince me, through his dialogue with you, that you're making a knowing, intelligent waiver, then I would grant his motion to withdraw and allow you to represent yourself.

So because of that mitigation, merger, defenses, if you want to put any of that in the record so that Mr. Thompson could tell us he understands that.

{¶12} In open court, counsel had Thompson confirm that he understood every charge against him, the potential penalties for each charge, and Reagan-Tokes

sentencing. Counsel discussed filing a motion to suppress the search warrant, the requirement to act as any other lawyer, and the disadvantages to self-representation. Thompson confirmed that counsel had discussed hearsay and how to question witnesses, and the requirement to learn and follow the rules of evidence.

{¶13} The court ensured that Thompson understood that he must follow the rules of procedure and evidence and ask proper questions. The court explained objections, and that if a question were improper, Thompson could ask the question properly, but the judge could not assist him. The court discussed jury selection, Thompson's opportunity to question the jurors, and sidebars. Thompson assured the court of his willingness to participate in the trial. The court determined that no one had threatened or forced him to waive his right to counsel, and that it was his wish to represent himself.

{¶14} The court allowed Thompson's counsel to withdraw and decided to appoint standby counsel. The court explained the role of standby counsel to Thompson and informed him that counsel could assist with witnesses, prepare exhibits, answer questions, help him overcome any obstacles with the rules and procedure, research, and assist with strategy decisions. The court instructed counsel to provide all discovery marked counsel's-eyes-only to standby counsel.

{¶15} At the final pretrial hearing, Thompson objected to the entire proceeding and challenged the court's jurisdiction to proceed. Thompson refused to answer the court's questions regarding his readiness for trial and continued to interrupt the court. The court repeatedly warned him that if he continued to refuse to respond to questions and interrupt the court, he would be found in contempt of court. Thompson remained unresponsive and repeatedly objected. Thompson refused to stipulate to his prior conviction and continued to demand that the court prove its

jurisdiction. When repeatedly ordered to sit at the counsel table, Thompson refused and remained standing. After several more warnings regarding contempt, Thompson continued to remain standing and to challenge the court's jurisdiction. The court warned him that if he continued to be disruptive, she would hold him in contempt. The case was continued for trial the following week.

{¶16} The trial was continued due to a scheduling issue, and Thomas agreed to the new trial date. The case was continued for another pretrial hearing. Almost immediately, Thompson refused to respond to the court's questions and insisted he was "not the all caps name Anthony Thompson" and did not consent to the proceedings. Thompson proceeded to inform the court, in a lengthy monologue, that the court must recognize he was there as the "beneficial equitable title" and recognize his notice of his "bill of complaint and equity." Thompson continued to disrupt the court and refused to respond to questioning. Thompson refused to accept the discovery disclosures provided by the prosecutor.

{¶17} The court informed the parties of the procedures for jury selection, COVID-19 protocols, and scheduling matters. Thompson objected to all procedures and demanded the court to take notice of his "bill of complaint and equity" that he had filed that morning and the previous motion he had filed, titled writ of quo warrant. The court informed him that the pleadings were "incomprehensible" and continued the case for trial.

{¶18} On the morning of trial, Thompson arrived 27 minutes late. While awaiting Thompson's arrival, the prosecutor informed the court that Thompson had not signed a counsel waiver. Once Thompson arrived, the court informed him of the process for selecting a jury, the rules regarding standby counsel, participating in sidebars, and the request for a written waiver of trial counsel. Thompson responded

8

by insisting he was not "Thompson" and that he objected and did not consent to the proceedings. Thompson admonished the court for refusing to address his notices, and he refused to sit when requested by the court because he did not "contract with the judge." The judge warned him multiple times that he would be held in contempt if he refused to follow her orders. Thompson continued to interrupt the court while refusing to sit.

{¶19} Thompson had filed a bill of complaint in equity presentment to void proceedings and jurisdiction. The complaint alleged that the court had converted the complaint, which Thompson defined as a promise to pay, into a draft, which Thompson defined as an order to pay. He further contended that the court only had equity jurisdiction because the matter concerned an express trust, and that courts of equity have exclusive jurisdiction over the property of infants and trusts. Because the matter involved an estate/trust, Thompson requested the court to "show cause via facts and conclusions of equitable law why he is not entitled to just compensation and other equitable relief to which he is entitled as equitable beneficial title holder."

{¶20} After a brief recess, the court presented an entry of waiver of counsel to Thompson, which he refused to accept. The court began to explain to Thompson that it denied all of his prior motions, and Thompson continued to interrupt the judge and talk over her. Thompson continued to question the court's jurisdiction, the corpus delecti, the location of the victim, and the identity of the person stating the claim. For a third time, Thompson asked the court to dismiss the charges for failing to prove jurisdiction.

{¶21} After repeated warnings, the court found Thompson in contempt for arguing with the court, delaying the proceedings, and refusing to sit. Thompson was arrested for contempt and removed from the court for processing at the jail. When the

9

matter resumed, Thompson objected and refused to remain seated. The court recited multiple reasons for holding Thompson in contempt, including that Thompson was recording the proceedings, and sentenced him to 30 days in jail.

**{¶22}** The court informed Thompson that if he continued to disrupt the proceedings, she would remove him from the courtroom, and he could participate remotely from the jail. Thompson asked the court who would pick the jury, and the court explained that he would participate in choosing the jury. Thompson repeatedly informed the court that he would not participate in the proceedings.

**{¶23}** The court questioned Thompson to ensure he wanted to proceed with the trial without an attorney. Thompson responded,

I don't. I want to go forward with what you need to prove. I understand this is a secret jurisdiction that you're operating under and all I ask is, where is the victim, where is the corpus delecti? What is the nature and cause of the crime? Not Hamilton County as the jurisdiction, where -- what court do you operate under; is this common law court or is this admiralty court? I've asked you these questions over and over again for months and you continue to move forward with the proceedings and you continue to deny me – deny my request. You ignore me. You struck out my filings. You forced me to take a lawyer. You have done all these things from the Bench. Today, I'm not – I just don't consent. You can't force me to go to trial. You cannot force me into trial.

. . .

Why are you forcing this on me? Why are you forcing that on me? You already forced [standby counsel] on me. Why are you forcing

counsel on me?

**{¶24}** Thompson refused to participate further and interrupted the court's attempt to read him the waiver-of-counsel entry and refused to sign the entry. The court found him in contempt for a second time for repeatedly speaking over the court and continuing to delay the proceedings. The court ordered that Thompson appear remotely for trial with standby counsel. The court further found that the trial could not proceed with him present due to his constant disruptions. The court recessed and ordered that jury selection would proceed with Thompson appearing remotely.

**{¶25}** When the proceedings resumed, the court learned that Thompson was in the hallway outside of the remote room. An officer from the jail reported to the court that the remote video-conferencing link had been set up, but Thompson was refusing to appear remotely. Thompson was placed in a restraint chair and forced to appear remotely. Standby counsel was present with Thompson.

**{¶26}** The court asked Thompson if he would appear voluntarily to avoid the restraint chair. Thompson responded by repeating, "I don't understand. I don't consent. I don't accept." The court found him in contempt for a third time for refusing to voluntarily enter the video-conferencing room and delaying the proceedings for more than 30 minutes. As a punishment, the court ordered him to appear remotely in the restraint chair. The court read him the entry waiving counsel. Thompson refused to answer the court's questions and refused to sign the waiver. Thompson insisted that "[y]ou can't force me [to] go forward with these proceedings."

**{¶27}** The prospective jurors were brought into the court. Thompson participated via Zoom, and the restraint chair was not visible to the prospective jurors. When the prosecutor finished his questioning, court adjourned for the day.

**{¶28}** The following morning, Thompson refused to appear in court so the

judge could inquire if he would join them in the courtroom for trial and obey all rules, procedures and orders. Thompson refused to leave his jail pod, so the court ordered security to bring him to the remote room. The court informed Thompson that he had the right to not participate in the proceedings and asked him if he would appear voluntarily. Thompson was unresponsive to the court's questions. The court gave him the opportunity to appear in person wearing his personal clothing.

{¶29} When Thompson again questioned the court's jurisdiction, the court informed him that he could participate remotely, and if he chose not to appear, the trial would proceed without him, and the court would instruct the jury not to consider Thompson's absence for any purpose. The court informed him, "If you are not on the Zoom when we assemble the jury at 9:30, we will proceed without you and I'll give the jury an instruction."

{¶30} Thompson continued to ignore the court's questions, explained he was the "equitable title holder," and he did not consent to the proceedings. The court explained the voir dire procedures to Thompson. Thompson asked if he were required to be present, and the court explained that it was his choice. Thompson responded, "I don't consent to none of this. I don't want to be here at all and you're forcing me to be here."

{¶31} The court took a brief recess to bring the jury into the courtroom. When the trial resumed, Thompson was not present remotely because he chose to return to his jail pod. Thompson's standby counsel informed the court that Thompson stated that he was not coming back. The trial proceeded without Thompson.

{¶32} The court read the following instruction,

So, ladies and gentlemen of the jury, the Defendant has decided he will not be present in court during the trial. Your duty is to determine

the guilt or innocence of Mr. Thompson based on the testimony you hear from the witness stand and the exhibits admitted into evidence. The fact that Mr. Thompson is not present during the trial is not evidence of guilt or innocence. It may not be considered by you for any purpose. It may not, in any way, influence or affect the verdict you may ultimately reach in this case.

Does anyone have trouble following that instruction?

**{¶33}** Juror 15, who was uncomfortable with Thompson's decision to represent himself, expressed discomfort with his nonparticipation, "understanding that it's his choice, but seeing it as an inequitable proceeding if he is not engaged, so I just wanted to articulate that again, because you asked." Juror 15 said that it would influence her ability to make a decision.

**{¶34}** After voir dire was finished, the court excused Juror 10 for cause because she could not be fair and impartial towards Thompson because her best friend's child was addicted to fentanyl. Juror 14 was also stricken for cause because her nephew was convicted of drug and gun charges, and she did not believe she could be fair and impartial. Juror 15 was excused for cause because she admitted Thompson's decision to represent himself and to not participate would affect her deliberations.

**{¶35}** The first witness testified that he was an investigator with the prosecutor's office. In 2008, he had investigated a shooting in which Anthony Thompson was convicted of involuntary manslaughter. A certified copy of the record of conviction was entered into evidence. The witness identified Thompson as the same individual convicted of involuntary manslaughter.

**{¶36}** The next witness, a Cincinnati police officer with the violent crimes

squad, testified that he investigated an allegation of drug trafficking at 288 McGregor. A CI informed him of a phone number and street name of the person who had sold him fentanyl and heroin. The CI showed him a cash app that was connected to the phone number. The cash app account was in Anthony Thompson's name. The officer showed the CI photos of several people named Anthony Thompson, and the CI identified the Anthony Thompson who appeared in the courtroom the previous day via Zoom. The officer testified that the recording was taken a few days before the search warrant was executed. The first photo depicted a kitchen counter with a blender that contained fentanyl. The blender was used to mix the fentanyl with baby powder and xylazine. The next photo showed Thompson with a large bag of drugs in his hand. Thompson was shown weighing drugs on a scale in another photo with marked currency that the police had given to the CI. The last photo depicted Thompson opening the door and allowing the CI to enter his home.

**{¶37}** The officer testified that the identity of the CI was kept confidential for the CI's safety. He further explained that Thompson had a prior history of killing people. The prosecutor asked to approach the judge, and informed the court that the officer's statement regarding Thompson's criminal history was improper and requested a curative instruction. The court immediately instructed the jury that the officer's statement was incorrect. The court further informed the jury that the prior conviction could only be considered for the limited purpose of establishing that Thompson had a prior conviction that made him ineligible to possess a firearm.

**{¶38}** The officer continued to testify and identified several photos that were taken after the search warrant was executed. One of the photos depicted the drugs that were recovered along with the blender, digital scales, and baggies. Exhibit 6 showed a .32-caliber revolver that was found in the drawer of the headboard of

Thompson's bed. Several pieces of mail addressed to Thompson were found in the bedroom with the address of 288 McGregor, including an energy bill. A photo of a Glock 9 mm handgun that was found on top of Thompson's bed was admitted into evidence. The last three photos showed a cabinet where the drugs were found, the open cabinet with the drugs, and the counter with the scales and baggies.

**{¶39}** The officer testified that both guns were operable and had been test fired by another officer. The Glock had one round in the chamber and six rounds in the magazine when it was recovered. A box of .32 Magnum hollow point rounds was found next to the .32-caliber revolver. The officer was shown the lab report showing that the substances found in the home tested positive for fentanyl, a heroin mix, and cocaine. The chief drug analyst at the crime laboratory testified that she tested the drugs and completed the lab report. The report was admitted into evidence.

**{¶40}** Next, the officer testified about several jail calls made by Thompson. On one call, Thompson explained that a few grams of drugs were found, and on another call, Thompson speculated that his roommate may have been the CI. Thompson was trying to determine who the CI was and discussed that his phone number could be linked through the cash app. During one of the calls, Thompson discussed all of his possessions that the police removed from his home. The captain of the jail services division authenticated the calls. The calls were played for the jury. The officer's testimony was continued in progress to allow other witnesses to testify.

**{¶41}** An employee of the Hamilton County Office of Engineering testified that he measured the distance between Thompson's home and the William H. Taft Elementary School. The school was 980 feet from Thompson's home.

**{¶42}** The trial was continued in progress. The following day, Thompson appeared remotely. The court gave him the opportunity to appear in court, but he

declined. The court informed Thompson that the State intended to rest that morning, and he could call witnesses and testify on his own behalf.

{¶43} The court notified the parties that Juror 22 had COVID-19 and would be excused, and Thompson objected "because the *United States vs. Griffith* states no government employee is not qualified to sit on a jury. I didn't get a chance to question any of the jury seated so I object to that."

{¶44} The trial resumed with the State playing the last jail call. After the call was played, Thompson cross-examined the officer. Thompson asked the officer if he had read Thompson his *Miranda* rights after his arrest. The officer responded that he did not because he did not question Thompson. Thompson asked the officer how he determined which bedroom belonged to Thompson. The officer testified that the home had two bedrooms. When they executed the search warrant, they found Thompson's roommate asleep in one bedroom with a woman. The other bedroom contained paperwork in the headboard drawer with Thompson's name and address. After the officer's cross-examination, both parties rested, and the court took a recess before closing arguments.

{¶45} When the verdict was returned, the court informed security to have Thompson return to the Zoom room, but Thompson did not appear for the verdict. The jury found him guilty of all of the charges. The court terminated the remainder of Thompson's 30-day sentence for contempt. The trial court ordered a presentence investigation and continued the matter for sentencing.

{¶46} The court imposed a sentence of four years on Count 1, two years on Count 3, and two years on Count 5, with the sentences on Counts 1, 3, and 5 to be served concurrently. On the WUD conviction, the court imposed a two-year sentence to be served consecutively to the sentence imposed on Count 1 for a total aggregate

term of six to eight years' incarceration.

**{¶47}** The court discussed the harm to the community from deaths and addiction to fentanyl. The court explained that the consecutive sentences were necessary to protect the public because this was Thompson's second conviction for WUD. The court further found that the consecutive sentences were not disproportionate to the seriousness of his conduct and not disproportionate to the danger of reoffending. Additionally, at least two of the offenses were committed as part of one course of conduct, and his "history of criminal conduct [made] consecutive sentences necessary to protect the public from future crime."

**{¶48}** Thompson now appeals, raising 14 assignments of error.

### Jurisdiction

**{¶49}** In his first assignment of error, Thompson contends the trial court's judgment is void due to a lack of jurisdiction where the indictment was not signed by the grand jury foreperson, did not indicate it was a true bill, and was not endorsed by the clerk of court.

**{¶50}** R.C. 2941.29 provides, in relevant part, that no conviction "be set aside or reversed on account of any defect in form or substance of the indictment or information, unless the objection to such indictment or information, specifically stating the defect claimed, is made prior to the commencement of the trial . . . ." Similarly, Crim.R. 12(C)(2) requires that "[d]efenses and objections based on defects in the indictment, information, or complaint (other than failure to show jurisdiction in the court or to charge an offense, which objections shall be noticed by the court at any time during the pendency of the proceeding)" must be raised prior to trial. The failure to raise these issues before trial results in a waiver of these defenses or objections. Crim.R. 12(H).

17

**{¶51}** Thompson claims he did not waive the issue because he repeatedly objected to the court's jurisdiction, but none of his objections challenged the sufficiency of the indictment. Thompson's objections were based on the fact that the matter concerned an estate/trust, and the court's jurisdiction was limited to equity. Thus, Thompson failed to challenge the indictment and waived that issue. *See* Crim.R. 12(C)(2) and 12(H); R.C. 2941.29.

**{¶52}** Moreover, it is well settled that any defect in the indictment is unrelated to a court's subject-matter jurisdiction. *Chapman v. Jago*, 48 Ohio St.2d 51 (1976); *Orr v. Mack*, 83 Ohio St.3d 429, 430 (1998). Common pleas courts have subject-matter jurisdiction over felonies. *State v. Harper*, 2020-Ohio-2913, ¶ 25; R.C. 2931.03; Ohio Const., art. IV, § 4(B). As the *Harper* Court explained, R.C. 2931.03 provides that,

> [t]he court of common pleas has original jurisdiction of all crimes and offenses, except in cases of minor offenses the exclusive jurisdiction of which is vested in courts inferior to the court of common pleas. Accordingly, [j]urisdiction over all crimes and offenses is vested in the court of common pleas, general division, unless such jurisdiction specifically and exclusively is vested in other divisions of the court of common pleas or in the lower courts.

*Id.*, quoting *State v. Aalim*, 2017-Ohio-2956, ¶ 2.

**{¶53}** Additionally, the trial court had personal jurisdiction by virtue of Thompson's appearance before the court under indictment on felony charges. *See State v. Rogers*, 2021-Ohio-2575, ¶ 8 (1st Dist.). Personal jurisdiction "is actually acquired by or conferred upon the court through the voluntary appearance and submission of the defendant or his legal representative." *State v. Poissant*, 2009-Ohio-4235, ¶ 21, citing *State v. Smith*, 2007-Ohio-3182, ¶ 21 (7th Dist.), citing

18

*Maryhew v. Yova*, 11 Ohio St.3d 154, 156 (1984).

**{¶54}** Thus, the trial court had subject-matter and personal jurisdiction, and the judgment is not void. We overrule the first assignment of error.

## Contempt

**{¶55}** In his second assignment of error, Thompson argues that the trial court erred by finding Thompson in direct contempt and removing him from the courtroom.

**{¶56}** Thompson was found guilty on two separate occasions of criminal contempt, the first on June 17, 2024, and the second on June 18, 2024. The trial court journalized two entries finding Thompson in criminal contempt and imposing sentence, the first on June 17 and the second on June 18. The court found him guilty of a third contempt, but never journalized an entry convicting him and imposing a sentence. Thompson filed his notice of appeal on July 30, challenging the entry imposing sentence that was journalized on July 29. Notably, Thompson did not appeal the orders finding him in contempt of court.

**{¶57}** Generally, a criminal appeal must be filed within 30 days of the entry of the judgment or order being appealed. App.R. 4(A), *In re H.F.*, 2008-Ohio-6810, ¶ 10. If a party fails to file a notice of appeal within 30 days as required by App.R. 4(A), an appellate court does not have jurisdiction to entertain the appeal. *Robinette v. Bryant*, 2015-Ohio-119, ¶ 36. "The timely filing of a notice of appeal under this rule is a jurisdictional prerequisite to [an appellate court's] review." *Id.* A judgment entry finding a party in contempt and imposing a sentence is a final appealable order. *Spears v. Botello*, 2025-Ohio-930, ¶ 6 (5th Dist.). Thus, Thompson was required to file his notice of appeal within 30 days of the court's entries finding him in contempt and imposing sentence. *Peterson v. Peterson*, 2004-Ohio-4714, ¶ 8 (5th Dist.) (imposition of the sentence for contempt "constituted a final appealable order, from

which appellant did not timely appeal."). Thompson did not timely appeal the contempt convictions.

**{¶58}** Accordingly, this court lacks jurisdiction to consider this assignment of error. Even if this court had jurisdiction, Thompson has already served his sentence, so the matter is moot. *See In re Chambers*, 2019-Ohio-3596, ¶ 3 (1st Dist.) (holding that defendant's appeal of the contempt was moot where defendant failed to seek a stay and voluntarily served the sentence). We dismiss the second assignment of error.

## Removal from the Courtroom

**{¶59}** In his third and fourth assignments of error, argued together, Thompson contends that the trial court violated his rights to due process, a fair trial, and to confront the witnesses against him by removing him from the court and requiring him to appear remotely.

**{¶60}** "A defendant's right to be present at every critical stage of a trial is guaranteed by the United States Constitution's Sixth Amendment's Confrontation Clause and the Fifth Amendment's Due Process Clause" and by Article I, Section 10 of the Ohio Constitution. *State v. Hurt*, 2024-Ohio-3115, ¶ 54 (1st Dist.). However, a defendant's right to be present at trial is not absolute. *State v. White*, 82 Ohio St.3d 16, 18 (1998).

**{¶61}** "[A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois v. Allen*, 397 U.S. 337, 343 (1970). "Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts

and judicial proceedings." *Id.*

**{¶62}** A defendant's absence from the trial does not necessarily result in prejudicial or constitutional error. *State v. Grate*, 2020-Ohio-5584, ¶ 83. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.*, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-108 (1934); *State v. Frazier*, 2007-Ohio-5048, ¶ 139.

**{¶63}** Crim.R. 43(B) contemplates the exclusion of a defendant from the courtroom for disruptive behavior and provides,

> Where a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence, the hearing or trial may proceed in the defendant's absence or by remote presence, and judgment and sentence may be pronounced as if the defendant were present. Where the court determines that it may be essential to the preservation of the constitutional rights of the defendant, it may take such steps as are required for the communication of the courtroom proceedings to the defendant.

**{¶64}** The right to be present may be voluntarily waived through the defendant's conduct. *Diaz v. United States*, 223 U.S. 442 (1912); *State v. Kidd*, 2020-Ohio-4994, ¶ 22 (6th Dist.); *State v. Meade*, 80 Ohio St.3d 419, 421. "When a defendant refuses to leave his or her cell to attend a court proceeding, the defendant is considered voluntarily absent." *State v. Harris*, 2023-Ohio-3271, ¶ 37 (2d Dist.), citing *Grate* at ¶ 85 ("Grate voluntarily made himself absent from the hearing by refusing to leave his cell and attend the video hearing."); *State v. Logan*, 1988 Ohio

App. LEXIS 1533, *4 (10th Dist. April 28, 1988) (defendant's refusal to leave his cell and attend his trial and sentencing hearing constituted disruptive behavior that allowed the trial to proceed in his absence).

{¶65} A review of the record demonstrates that, on the morning of trial, Thompson arrived 27 minutes late. Once Thompson arrived, the court informed him of the process for selecting a jury, the rules regarding standby counsel, participating in sidebars, and the request for a written waiver of trial counsel. Thompson responded by insisting he was not "Thompson," and that he objected and did not consent to the proceedings. Thompson admonished the court for refusing to address his "notices" and refused to sit when requested by the court because he did not "contract with the judge." After repeated warnings, the court found Thompson in contempt for arguing with the court, delaying the proceedings, and refusing to sit.

{¶66} When the matter resumed, Thompson objected and refused to remain seated despite the court informing him that he should be seated for court safety reasons. Thompson refused to participate further and interrupted the court's attempt to read him the waiver-of-counsel entry and refused to sign the entry. The court found him in contempt for a second time and ordered that Thompson appear remotely for trial with standby counsel.

{¶67} When the proceedings resumed, Thompson refused to appear remotely. Thompson was placed in a restraint chair and forced to appear remotely. The prospective jurors were brought into the court. Thompson participated via Zoom, and the restraint chair was not visible to the prospective jurors.

{¶68} The following morning, Thompson refused to participate and chose to remain in his jail pod, and the trial proceeded without him. Thompson appeared remotely on the second day of trial and cross-examined one witness and gave a closing

statement.

**{¶69}** The trial court informed Thompson that he had the right to be present and repeatedly informed him that he could appear in the courtroom if he agreed to follow the rules. If he did not wish to follow the rules, Thompson was encouraged to participate remotely. Thompson refused to willingly participate in the trial despite being repeatedly advised of his right to be present at trial.

**{¶70}** "When a defendant is aware of his right to be present at trial, his voluntary decision not to leave his cell to attend the trial acts to waive his right to be present at all critical stages of the trial." *State v. Lee*, 2024-Ohio-1802, ¶ 35 (2d Dist.); *Harris*, 2023-Ohio-3271, at ¶ 37 (2d Dist.); *Grate*, 2020-Ohio-5584, at ¶ 85; *Logan*, 1988 Ohio App. LEXIS 1533, at *4. Thus, Thompson waived his right to be present by refusing to leave his jail pod to attend the trial. *See Lee* at ¶ 35; *Harris* at ¶ 37; *Grate* at ¶ 85; *Logan* at *4. "Concluding otherwise would allow a defendant to refuse to leave his cell and indefinitely prevent his trial." *Lee* at ¶ 36.

**{¶71}** Moreover, under the invited-error doctrine, Thompson cannot attack a judgment for errors he committed or for errors that he induced the court to commit. *See Harris* at ¶ 46. By refusing to attend portions of the trial and cross-examine the State's witnesses, Thompson invited any error committed by the court. *Id.*

**{¶72}** Thompson argues that pursuant to *State v. Meade*, 1997-Ohio-332, the trial should have been continued until he was present. In *Meade*, the defendant was present in the courtroom before trial but, upon learning that a conviction would result in a prison term, he absconded before jury selection began. Meade never appeared for his trial, and he was found guilty in absentia, over defense counsel's objections. The Ohio Supreme Court concluded that commencing the trial in Meade's absence had violated Crim.R. 43(A)(1), and that the trial court should have continued the trial until

Meade reappeared or was apprehended. *Id.* at 424. The Court reiterated that a defendant's right under Crim.R. 43(A) is not absolute, and a defendant's voluntary absence "after the trial has been commenced in [the defendant's presence] is deemed a waiver of the right to be present." *Id.* at 421. Thus, *Meade* does not apply here where Thompson refused to attend the trial. *See Lee* at ¶ 36.

**{¶73}** Accordingly, we overrule Thompson's third and fourth assignments of error.

### Waiver of Counsel

**{¶74}** Next, Thompson contends that the court violated Thompson's right to counsel because he did not execute a written waiver and did not engage in a meaningful colloquy.

**{¶75}** We review the propriety of the defendant's waiver of counsel de novo. *State v. Wallace*, 2024-Ohio-4886, ¶ 24 (1st Dist.).

**{¶76}** A defendant's right to counsel during the critical stages of a prosecution is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section I of the Ohio Constitution. *State v. Sherman*, 2023-Ohio-2142, ¶ 19 (1st Dist.). This includes the independent constitutional right to dispense with a lawyer's help when a defendant knowingly, intelligently, and voluntarily chooses to waive counsel. *State v. Martin*, 2004-Ohio-5471, ¶ 23, citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942).

**{¶77}** Crim.R. 44 provides the procedure to waive counsel in a serious offense. Before waiving counsel, defendants must be "fully advised of their right to assigned counsel" and knowingly, intelligently, and voluntarily waive their right to counsel. Crim.R. 44(A). A trial court only needs to substantially comply with Crim.R. 44. *Martin* at ¶ 38. Under Crim.R. 44(A), the trial court must make "a sufficient inquiry

24

to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel." *Id.* at ¶ 39. To that end, the court must ensure the defendant understands "the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *State v. Gibson*, 45 Ohio St.2d. 366, 377 (1976). "The defendant must make an intelligent and voluntary waiver with the knowledge he will have to represent himself, and the dangers inherent in self-representation." *State v. Ngaka*, 2020-Ohio-3106, ¶ 9 (5th Dist.).

{**¶78**} Crim.R. 44(C) further provides that the waiver must be done in open court, recorded, and in writing. "The failure to execute a written waiver is harmless error where the trial court engages in a sufficient colloquy to determine whether the defendant fully understands and intelligently relinquishes the right to counsel." *State v. Walker*, 2025-Ohio-975, ¶ 34 (1st Dist.), citing *State v. Wallace*, 2024-Ohio-4886, ¶ 26 (1st Dist.), citing *Martin* at ¶ 40.

{**¶79**} Here, Thompson contends that the court engaged in no meaningful colloquy with him to determine if his waiver was knowing, intelligent, and voluntary. Thompson points to the colloquy that the court attempted to have with Thompson where Thompson refused to answer the court and continuously disrupted the court proceedings. After that exchange, the court did not allow Thompson to represent himself. Thompson fails to acknowledge or address the second colloquy conducted at a later hearing. During that extensive colloquy, Thompson acknowledged that he understood the charges, the potential penalties, the proceedings, the legal issues, the disadvantages of self-representation, the requirement to follow the rules of evidence and criminal procedure, and the role of standby counsel.

**{¶80}** On the day of trial, the court attempted to get Thompson to sign a counsel waiver at the request of the prosecutor. The court prepared a lengthy counsel waiver that Thompson refused to take. Thompson continuously interrupted the court and disrupted the proceedings, so he was required to appear via Zoom. The court read the entire five-page form to him, which explained the charges, the potential penalties, possible defenses, the right to and benefits of counsel, the responsibilities of self-representation, and his option to change his mind and have counsel appointed, but he refused to sign it. Thompson's refusal to sign the form was harmless error where the prior colloquy was sufficient to establish Thompson's waiver was knowing, intelligent, and voluntary. *See Walker* at ¶ 34 ("The failure to execute a written waiver is harmless error where the trial court engages in a sufficient colloquy to determine whether the defendant fully understands and intelligently relinquishes the right to counsel."); *Wallace* at ¶ 26; *Martin* at ¶ 40.

**{¶81}** We overrule the fifth assignment of error.

### Other-Acts Evidence

**{¶82}** In his sixth assignment of error, Thompson argues that the trial court erred by admitting prohibited other-acts evidence that Thompson engaged in prior trafficking. Specifically, Thompson contends that the photos and testimony regarding the CI's purchase of drugs that prompted the search warrant for Thompson's home was inadmissible other-acts evidence under Evid.R. 404(B).

**{¶83}** A trial court is vested with broad discretion in determining the admissibility of evidence. *State v. Edwards*, 2011-Ohio-1752, ¶ 15 (1st Dist.). However, the failure to object to the admission of prior bad acts results in the application of a plain-error standard of review. *See* Crim.R. 30(A); *State v. Harris*, 2017-Ohio-5594, ¶ 15 (1st Dist.). Notice of plain error is to be taken with the utmost

caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail on a claim that the trial court committed plain error, Thompson must demonstrate that "an error occurred, that the error was obvious, and that there is 'a reasonable *probability* that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis added in *Rogers*.) *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 22.

**{¶84}** Thompson "failed to invoke the plain-error doctrine on appeal, much less make a showing that plain error occurred below. Under these circumstances, we need not address it." *State v. Body*, 2021-Ohio-703, ¶ 23 (8th Dist.), citing *State v. Gavin*, 2015-Ohio-2996, ¶ 25 (4th Dist.), citing *State v. Quarterman*, 2014-Ohio-4034, ¶ 17-20 (an appellate court need not consider plain error where appellant fails to timely raise plain-error claim); *In re A.R.*, 2016-Ohio-4919, ¶ 33 (12th Dist.) (appellant is precluded from raising plain error on appeal where he does not argue it in his brief).

**{¶85}** Even if Thompson had argued plain error, the assignment of error has no merit. Under Evid.R. 404(B), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The rule prohibits evidence that tends to establish the accused "has a propensity or proclivity to commit the crime in question." *State v. Hartman*, 2020-Ohio-4440, ¶ 21. Evidence may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Evid.R. 404(B)(2).

**{¶86}** It is not necessary to exclude evidence of other conduct when "the 'other acts' form part of the immediate background of the . . . crime charged in the

27

indictment." *State v. Curry*, 43 Ohio St.2d 66, 73 (1975). "Other-acts evidence is admissible when the acts form a part of the 'immediate background of the act' as part of the charged crime." *State v. Warth*, 2023-Ohio-3641, ¶ 57 (1st Dist.), quoting *State v. David*, 2021-Ohio-4004, ¶ 16 (1st Dist.).

{¶87} Here, the photos and testimony about the controlled buy were relevant and necessary to explain the basis for the search warrant and to "tell[ ] the story of these crimes." *See State v. Knuff*, 2024-Ohio-1194, ¶ 118. Evidence that Thompson engaged in selling drugs to a confidential informant in his home was not presented to prove his character or that he acted in conformity with that character. *See id.* Rather, the evidence provided the immediate factual background for the offenses with which Thompson was charged, established his knowledge of the drugs in his home, and absence of mistake. *See State v. Orrell*, 2024-Ohio-1194, ¶ 45 (7th Dist.) (explaining that controlled buys within a week of the search warrant were admissible to show defendant knew the drugs were in his home).

{¶88} Accordingly, we overrule the sixth assignment of error.

## Authentication

{¶89} Next, Thompson challenges the admission of the photos of the CI purchasing drugs from Thompson for a lack of authentication. Thompson did not object at trial and failed to invoke the plain-error doctrine on appeal. Consequently, we need not address the assignment of error. *See Body*, 2021-Ohio-703, at ¶ 23 (8th Dist.), citing *State v. Gavin*, 2015-Ohio-2996, ¶ 25 (4th Dist.).

{¶90} However, the still shots from a recording device the CI was wearing during the controlled buys in Thompson's home were admitted after the investigating officer testified that the CI was wearing a recording device that was functioning properly. The officer further confirmed that the images were a fair and accurate

depiction. Under the silent-witness theory, the officer provided "a sufficient showing of the reliability of the process or system that produced the photographic evidence." *See State v. Rasheed*, 2023-Ohio-906, ¶ 13 (1st Dist.), quoting *Midland Steel Prods. Co., v. U.A.W. Local 488*, 61 Ohio St.3d 121, 130 (1991). The "silent witness" theory "does not require an independent sponsoring witness because the evidence speaks for itself and is admissible when there is 'a sufficient showing of the reliability of the process or system that produced the photographic evidence.'" *Id.* Accordingly, we overrule the seventh assignment of error.

### Operability of the Firearm

{¶91} In the eighth assignment of error, Thompson argues that the trial court erred by allowing the investigating officer to testify to the operability of the recovered firearms without personal knowledge of the matter, as required by Evid.R. 602. We need not address this assignment of error because Thompson did not object at trial and did not include a plain-error argument on appeal. *See Body* at ¶ 23. Even if Thompson had invoked the plain-error doctrine, the assignment of error is without merit.

{¶92} "Operability of a firearm may be established by an operability report or testimony of a witness who had test-fired the weapon, but it also may be established by circumstantial evidence." *State v. Pope*, 2019-Ohio-3599, ¶ 7 (1st Dist.). "[E]vidence that a gun was loaded combined with the submission of that gun into evidence is sufficient to prove operability." *State v. Allah*, 2015-Ohio-5060, ¶ 11 (4th Dist.), citing *State v. Dickerson*, 2015-Ohio-938, ¶ 36 (11th Dist.). Other evidence showing operability includes the actual gun and bullets. *See State v. Messer*, 107 Ohio App.3d 51, 55 (9th Dist. 1995).

{¶93} Here, the investigating officer testified that a .32-caliber revolver was

29

found in the headboard drawer with a box of .32-caliber ammunition and mail addressed to Thompson. A loaded Glock 9 mm handgun was found on top of Thompson's bed. The Glock was shown to the jury, and a photo of the Glock was admitted into evidence. The Glock had one round in the chamber and six rounds in the magazine when it was recovered. The officer testified that both guns were operable and had been test fired by another officer. The officer showed the firearms, test-fire packets, and blank cartridges used in the test-fires to the jury. This evidence was sufficient to prove operability. *See Allah* at ¶ 11; *Dickerson* at ¶ 36.

{¶94} We overrule the eighth assignment of error.

### Unredacted Affidavit

{¶95} In his ninth assignment of error, Thompson asserts that the court erred by allowing the State to withhold "for counsel only" material from the pro se defendant.

{¶96} When Thompson was represented by counsel, his first counsel sought the unredacted affidavit to determine whether the information relied on by the police was stale. Counsel explained to the court that the redacted affidavit he received did not contain the dates of the controlled buys. Thompson's second counsel was given an unredacted copy of the affidavit. Counsel informed the court that after viewing the affidavit, speaking with the investigating officer, and conducting extensive research, he determined that a motion to suppress was not appropriate.

{¶97} Thompson's third counsel informed the court that Thompson wished to file a motion to suppress. Counsel did not know the basis of the motion, but speculated that "one might require the affidavit to be attached." The court instructed counsel to provide the unredacted affidavit to standby counsel.

{¶98} Thompson contends that the court erred by directing the State to

withhold the unredacted affidavit from Thompson. He further contends that the affidavit was critical for Thompson to pursue a motion to suppress and to cross-examine the investigating officer. However, the only redaction in the document available to Thompson was the dates of the controlled buys, and counsel does not explain how the dates would have been critical for a motion to suppress or to cross-examine the officer. After reviewing the unredacted affidavit and conducting research, Thompson's second counsel determined a motion to suppress was not warranted. Additionally, standby counsel had the unredacted copy, and Thompson was informed that standby counsel could assist him with research and strategy decisions.

{¶99} Consequently, Thompson's assignment of error is speculative and does not set forth any error by the court or any prejudice to Thompson. Accordingly, we overrule the ninth assignment of error.

## Competency Hearing

{¶100} Next Thompson argues that the trial court erred by finding Thompson competent to stand trial without conducting a competency hearing.

{¶101} "Fundamental principles of due process require that a criminal defendant who is legally incompetent may not be tried." *State v. Berry*, 72 Ohio St.3d 354, 359 (1995). Where the issue of a defendant's competency to stand trial has been raised, the trial court must determine the defendant's competency in accordance with R.C. 2945.37. R.C. 2945.37(B) provides that "the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial" and, "[i]f the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section."

{¶102} Under the statute, the defendant "is presumed to be competent to stand trial." R.C. 2945.37(G). This presumption may be overcome if, "after a hearing, the

court finds by a preponderance of the evidence" that the defendant is not competent. *State v. Adams*, 2004-Ohio-5845, ¶ 74. Under R.C. 2945.37(E), the parties may submit the competency report as evidence by stipulation. A defendant may waive his right to a competency hearing by stipulating to the competency report. *State v. O'Neill*, 2004-Ohio-6805, ¶ 21 (7th Dist.). "Where the parties stipulate to the contents of the competency reports which opine that the defendant is competent, the parties stipulate to competency and waive the competency hearing." *Id.*

{¶103} After the prosecutor suggested Thompson may be incompetent, the trial court appointed the Court Clinic to conduct an evaluation. A competency hearing was scheduled, and the Court Clinic report that was filed with the trial court concluded that Thompson was competent. Counsel stipulated to the contents of the competency reports, waiving the competency hearing. *See id.*

{¶104} Although Thompson now complains that the report contained information about sovereign citizenship, the court sua sponte struck that part of the report and disregarded the information.

{¶105} We overrule the tenth assignment of error.

### Sufficiency and Manifest Weight

{¶106} In his eleventh and twelfth assignments of error, Thompson argues that his convictions were unsupported by the evidence and contrary to the weight of the evidence.

{¶107} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000). "[T]he question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential

elements of the crime proved beyond a reasonable doubt." *State v. Ham*, 2017-Ohio-9189, ¶ 19 (1st Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶108}** In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* "Although an appellate court may review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily an initial determination for the trier of fact." *State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24.

**{¶109}** Thompson first contends that the State failed to prove that he possessed a firearm, and the firearm was operable. He further argues that the firearm was not on his person, the State presented no evidence that he was aware of the firearms, and two other persons were present in the home.

**{¶110}** R.C. 2923.13(A)(2) provides, in relevant part, "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . (2) The person . . . has been convicted of any felony offense of violence . . . ."

**{¶111}** Thompson contends that the State failed to prove that he had the firearms found on his bed and in his headboard drawer. To "have" a firearm means that the offender has "actual or constructive possession of the gun." *State v. Philpott*,

2020-Ohio-5267, ¶ 45 (8th Dist.), citing *State v. Gardner*, 2017-Ohio-7241, ¶ 33 (8th Dist). "A person is in 'constructive possession' if he is able to exercise dominion and control over an item, even if he does not have immediate physical possession of it." *State v. DeVaughn*, 2020-Ohio-651, ¶ 32 (1st Dist.), citing *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus, *overruled on other grounds*, *State v. Jenks*, 61 Ohio St.3d 259 (1991), syllabus.

{¶112} Constructive possession may be demonstrated through circumstantial evidence. *See State v. English*, 2010-Ohio-1759, ¶ 32 (1st Dist.). "But a person's mere presence in the vicinity of a firearm, alone, does not create an inference of constructive possession. Rather, constructive possession may be inferred from a combination of facts, such as an awareness of a firearm that is within easy reach." (Citations omitted.) *State v. Hicks*, 2023-Ohio-2209, ¶ 10 (1st Dist.). Possession of a firearm may be inferred when a defendant has exercised dominion and control over the area where the firearm was found. *Gardner* at ¶ 35.

{¶113} Viewed in a light most favorable to the State, this evidence supported a finding that Thompson constructively possessed the weapons. *See English* at ¶ 33.

{¶114} Thompson further argues that the State failed to meet its burden because there was no evidence that Thompson knew the firearms were on his bed or in his headboard.

{¶115} The State presented sufficient evidence that Thompson constructively possessed the firearms. Both guns were found in his bedroom, one on his bed, and one in the headboard drawer next to a box of ammunition and mail addressed to him. *See State v. Johnson*, 2024-Ohio-1147, ¶ 26 (1st Dist.) (sufficient evidence of constructive possession existed for firearm found in defendant's bedroom dresser); *State v. Munn*, 2009-Ohio-5879, ¶ 48 (6th Dist.) (evidence was sufficient to prove

constructive possession where firearm was found in defendant's bedroom near defendant's personal papers).

**{¶116}** Thompson further argues that the State presented no admissible evidence of operability. As previously discussed, the State presented sufficient evidence to establish operability.

**{¶117}** Next, Thompson argues that the State failed to prove that he possessed the drugs in his home or that he prepared the drugs for distribution because the drugs were found in the common area and no fingerprints or DNA evidence was introduced.

**{¶118}** "Possession of drugs can be either actual or constructive." *State v. Ritter*, 2024-Ohio-1336, ¶ 12 (3d Dist.), quoting *State v. Bustamante*, 2013-Ohio-4975, ¶ 25 (3d Dist.). "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus. "[C]onstructive possession of contraband may be proven solely by circumstantial evidence." *State v. Fogle*, 2009-Ohio-1005, ¶ 30 (11th Dist.). "The discovery of readily accessible drugs in close proximity to a person constitutes circumstantial evidence that the person was in constructive possession of the drugs." *State v. Wyche*, 2006-Ohio-1531, ¶ 18 (10th Dist.).

**{¶119}** The State presented evidence, via jail phone calls, that Thompson lived in the home where the police had found his drugs, the drugs had been confiscated from his home, and that the only way his phone number could be linked to him was through the cash app. While trying to identify the CI, Thompson discussed that he did not have "anyone pulling up," and referred to someone from a different neighborhood that he had "pull up" so the person did not see him exit from his home or know where he lived. Additionally, the State introduced evidence of the controlled buy showing Thompson

preparing the drugs for sale. Police identified Thompson's phone through the cash app he used to sell drugs to the CI. Any rational trier of fact could have found the State proved that Thompson constructively possessed the drugs and prepared the drugs for sale. *See Ham*, 2017-Ohio-9189, at ¶ 19 (1st Dist.).

{¶120} Viewed in the light most favorable to the State, the evidence was sufficient to prove that Thompson constructively possessed the drugs and prepared the drugs for sale.

{¶121} Viewing the evidence in the light most favorable to the State, we conclude that the State presented sufficient evidence to prove the charges against Thompson. Reviewing the entire record, weighing the evidence, and considering the credibility of the witnesses, we cannot conclude the trier of fact clearly lost its way and created a manifest miscarriage of justice. The factfinder was in the best position to determine the credibility of each witness, and we cannot conclude this record presents a scenario where the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

{¶122} Consequently, we overrule the eleventh and twelfth assignments of error.

### Consecutive Sentences

{¶123} In his thirteenth assignment of error, Thompson contends that the court erred by imposing consecutive sentences.

{¶124} Under R.C. 2953.08(G)(2)(a), an appellate court may review the trial court's consecutive-sentences findings, and it may "increase, reduce, or otherwise modify" consecutive sentences only if it "clearly and convincingly" finds that the record does not support the trial court's findings. "An appellate court's inquiry is limited to a review of the trial court's R.C. 2929.14(C) findings." *State v. Glover*, 2024-Ohio-

5195, ¶ 44; R.C. 2953.08(G)(2).

{¶125} Ohio law contains a statutory presumption of concurrent sentences for defendants convicted of multiple offenses. *State v. Galinari*, 2022-Ohio-2559, ¶ 9 (1st Dist.). "The general principle set forth in the Revised Code is that concurrent sentences are the default and consecutive sentences are the exception." *State v. Hitchcock*, 2019-Ohio-3246, ¶ 21. To impose consecutive sentences, a sentencing court must make the mandatory sentencing findings prescribed by R.C. 2929.14(C)(4). *See Galinari* at ¶ 9, citing *State v. McKinney*, 2022-Ohio-849, ¶ 11 (1st Dist.). A trial court must make three distinct findings: (1) "the consecutive service is necessary to protect the public from future crime or to punish the offender," (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and (3) one or more of R.C. 2929.41(C)(4)'s subsections apply. R.C. 2929.14(C)(4).

{¶126} Thompson asserts that the record does not support the trial court's imposition of consecutive sentences. Specifically, he contends that the "necessary findings" were not supported by the record because the firearms were not used as part of the drug offenses, and consecutive sentences were not needed to protect the public.

{¶127} In this case, the trial court considered the presentence investigation, Thompson's criminal history, the sentencing memoranda, and statements by counsel and Thompson. The court considered Thompson's prior conviction for involuntary manslaughter, which involved a gun, and a prior WUD conviction, in addition to his prior prison term, and multiple juvenile adjudications. The court discussed the harm to the community from deaths and addiction, including the stories relayed to her by the prospective jurors. The court explained that the consecutive sentences were necessary to protect the public because this was Thompson's second conviction for

WUD. This record does not clearly and convincingly fail to support the trial court's findings.

{¶128} We overrule the thirteenth assignment of error.

## Cumulative Error

{¶129} In his fourteenth assignment of error, Thompson contends that the cumulative effect of errors denied him due process and a fair trial.

{¶130} "The doctrine of cumulative error allows a conviction to be reversed if the cumulative effect of errors, deemed separately harmless, deprived the defendant of his right to a fair trial." *State v. Johnson*, 2019-Ohio-3877, ¶ 57 (1st Dist.). Thompson has failed to establish any instance of error, so we cannot find cumulative error. Accordingly, we overrule the fourteenth assignment of error.

## Conclusion

{¶131} Having overruled Thompson's first, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth assignments of error and dismissed the second for lack of jurisdiction, we affirm the judgment of the trial court.

Judgment affirmed and appeal dismissed in part.

CROUSE and NESTOR, JJ., concur.